156 S.W.3d 696 (2005)
In the Interest of J.M. and L.M., Minor Children.
No. 05-04-00306-CV.
Court of Appeals of Texas, Dallas.
February 28, 2005.
*697 CASA, McKinney, Loretta A. Keller, Attorney At Law, Plano, for Ad Litem.
Jimmy L. Verner, Jr., Verner & Brumley, Dallas, for Appellant.
Alyson Marie Dietrich, Asst. Criminal District Atty., and M. Emily Johnson-Liu, McKinney, for Appellee.
*698 John R. Roach, Collin County District Atty., John A. Stride, Asst. District Atty., McKinney, for the State.
Before Justices WRIGHT, FITZGERALD, and LANG-MIERS.

OPINION
Opinion by Justice FITZGERALD.
M.M. (Father) appeals the trial court's judgment terminating his parental rights to his children, J.M. and L.M. Father brings two issues on appeal asserting (1) the State was equitably estopped from terminating his parental rights and (2) the evidence was legally and factually insufficient to show that termination was in the children's best interest. We affirm the trial court's judgment.

FACTUAL BACKGROUND
J.G. (Mother) met Father when she was fourteen years old and working for Father and his first wife. Father was convicted in 1995 of assaulting his first wife, and they subsequently divorced. Father and Mother married in 1998, when she was eighteen years old and Father was thirty-eight. In 2000, Mother gave birth to their first child, J.M. When Mother became pregnant with their second child, L.M., born in 2002, Father took Mother and J.M. to Jordan to be with his family and to give birth to L.M. Father returned from Jordan several weeks before Mother. Mother returned sometime before August 2002.
Mother had been subject to drug addiction from an early age. She first used illegal drugs at age ten, and she has used them off and on throughout her life. She completed a drug-treatment program when she was thirteen, but she started using drugs again when she was fifteen or sixteen. She testified she never used illegal drugs in front of Father. She also used barbiturates, first prescribed after an auto accident when she was fourteen.
On August 6, 2002, Mother called the Richardson Police Department to get information about getting help because of Father's beating her. Officer Andrew Kviz spoke to Mother on the telephone, and he testified she sounded distraught, as if she had been crying for a while. Mother told Kviz her husband had assaulted her, giving her two black eyes, and that he made her keep her hands by her side while he assaulted her. Mother told Kviz she did not want the police coming to the house because she would be beaten in retaliation. Kviz gave Mother the telephone numbers for shelters and organizations that could help her, and he urged her to call them. Mother told Kviz she could not leave her husband because she could not support herself or her children without him. After hanging up, Kviz checked the telephone number from the call, and he noticed there had been several previous "alarm calls" to that address. Kviz dispatched officer Mike Kincy to the address to perform a "welfare check." Mother told Kincy that her husband had assaulted her and made her keep her arms down while he hit her across the arms. Kincy observed that Mother had two black eyes, which she had tried to hide with make-up and sunglasses, but he could not tell if her arms were bruised. Based on Kincy's report, Kviz filed a report that was forwarded to the district attorney's office.
On August 15, 2002, the Collin County branch of the Texas Department of Protective and Regulatory Services (the Department) received a referral, alleging that the previous week, Father had beaten Mother, been arrested, and was barred from the house for sixty days; that Mother was depressed, using drugs, and neglecting the children; and that the house was filthy.
*699 On August 23, 2002, the Department's investigator Brenda Smith went to the house to investigate. Smith learned there had previously been three "service" calls to the house for domestic violence. August 23, 2002 was a hot day, and the electricity was out in the neighborhood. Inside, the house was filthy. There were a few dirty diapers on the floor, including one in the children's bedroom. A "sippy cup" with juice in it had mold on the juice and mold growing around the mouthpiece. The kitchen floor was sticky, and the kitchen smelled of garbage. There were dirty dishes piled high in the sink. The refrigerator was "unclean," and there was a bottle of spoiled milk in the refrigerator. There were flies inside the house and gnats flying around the overflowing garbage bin. There were several Advil pills on the floor as well as other small items that could choke a child. The bathroom door was open, and used feminine hygiene products were on the floor. In the children's bedroom, the bedding smelled of urine, there were clothes piled on the floor, and toys were piled precariously in the closet such that they could easily fall and hurt a child. The master bedroom was also in disarray, with feces smeared on the floor. The children were very dirty and smelled bad, and their diapers were soiled and cold. L.M. had a rash around his rectum typical of a child left sitting in his feces for long periods of time. Smith pointed out to Mother a broken lighter that lay in a pool of lighter fluid, and Mother scolded J.M. for the mess, yelling very loudly.
Smith asked Mother how the house had gotten into this condition, and Mother blamed J.M., stating she could not control him. Smith saw welts on Mother's neck and arms, and Mother told her she had been beaten up by a woman in a store parking lot. While Smith was there, Mother placed L.M. in his crib, gave him a bottle of milk, and left him unattended. Smith took the bottle from L.M., examined the contents, and noticed the milk in it was spoiled. Smith called her supervisor and arranged for the children's removal to foster care that day. After removal, the children also received a medical examination in which J.M. tested positive for cocaine.
Smith talked to Mother and Father a few days later. Mother told her she had used cocaine and marijuana about three days before the children were removed. Mother told Smith she needed the cocaine to give her energy because she was tired, but she told Smith she did not bring the cocaine into the house. When Smith talked to Father, he appeared surprised that Mother was using drugs, and he denied having abused either Mother or his first wife. Father also told Smith that the house was not in that condition before he was barred from the house.
Rhyan Wilhelms, who lived across the street from Father and Mother, testified she had known Mother for about three to four weeks before the children's removal. Before the protective order barred Father from the house, Wilhelms would help Mother clean the house, and it would be clean when Father got home. However, the next afternoon, the house would be dirty again. Wilhelms testified that the condition of the house got substantially worse after Father was barred. Wilhelms spent a lot of time cleaning the night before Smith's visit, and when Smith arrived at the house, she had already spent a few hours that day cleaning the house.
Mother's aunt, Eva Meinhardt, testified that when Father, Mother, and J.M. went to Jordan before L.M.'s birth, the house was immaculate. However, Mother told Meinhardt that when Father returned from Jordan before her, he did nothing to keep the house clean; he did not take out *700 the garbage or do laundry, and the house was "completely destroyed" when Mother returned.
Meinhardt also testified that Mother told her Father first struck her during an argument when J.M. was about a year old. Mother told Meinhardt that it was her, Mother's, fault and that it would not happen again. However, Meinhardt testified that Father continued to beat Mother and that the beatings grew worse as the relationship progressed. On one occasion, Meinhardt saw Mother bruised from fighting with Father, and Mother had a miscarriage shortly thereafter. Meinhardt testified that about a month before the children were removed, Mother had bruises all over her face, neck, chest arms, and legs; Mother told her she and Father had gotten into a fist fight after she interrupted Father at the computer and told him to come to bed.
After the children were removed, the Department set up a plan with Father and Mother to achieve reunification of the children with the parents. From the beginning, however, Father was obstructionist in meeting the goals and in denial of the reasons leading to the removal of the children. Kathy Waffen, the Department's caseworker overseeing their case, testified that when the children were removed, the Department was looking for a suitable temporary placement for the children. The Department preferred placement with a relative or friend because it would permit more visitation between the children and parents. Mother's family was not suitable, and Father refused to suggest any of his family or friends because he did not want them to know of the removal.[1] The Department placed the children with an unrelated foster family that was also approved for adoption. However, with a foster family, Father and Mother had only one hour of visitation with the children per week. The Department required Father and Mother to complete several services, programs designed to make them better parents and addressing the reasons for the removal, including parenting classes, individual counseling, drug treatment for Mother, and a batterers intervention program for Father. The Department asked the parents to complete each service and to exhibit a change in attitude or circumstances reflecting they had learned from the services and become better parents or people. Father completed all the services the Department asked him to do, but he took a long time doing it, partly because he dropped out of the batterers intervention program after missing two sessions (only two absences were permitted in the program) and retook the program later. Mother failed to complete drug treatment and, after a while, prohibited her counselor from disclosing the communications during their counseling sessions to the Department. Father soon filed for divorce from Mother, which was rendered in November 2003.
Although Father completed all the services, the Department concluded he had not benefitted satisfactorily from them. In January 2003, after several months of the services, Father and Mother met with various people involved in the case at a "Permanency Plan Team" meeting. At the meeting, Father was questioned about his domestic violence issues and his understanding of why the children were removed. Father and Mother continued to *701 deny any responsibility for the children's removal. Following that meeting, the Department believed it had reached an impasse and changed the goal from reunification to termination. The Department did not immediately advise Father and Mother that it intended to seek termination.
Father continued to attend the services as required by the Department, including the batterers intervention program, but until the February 2003 meeting, he also continued to deny having ever engaged in any domestic violence. At the February 2003 meeting, Father admitted hitting his first wife; however, he minimized and tried to excuse his conduct by stating she was a bad wife and had spent all his money. Father continued to insist he had never physically abused Mother. On July 25, 2003, Father pleaded guilty to a criminal charge of assaulting Mother. The trial court deferred adjudication of Father's guilt and placed him on community supervision for nine months. Four days later, at the July 29, 2003 meeting, Father first admitted to any type of violence against Mother when he admitted that he slapped Mother in the face because she was blocking the television. Father also admitted he "pushed her face," giving her black eyes because she disturbed him while he was on the computer. Waffen told Father that even though he admitted the behavior, he was minimizing it. Father completed the batterers intervention program, but he received a low score for the accepting-responsibility part of the program because he only minimally admitted committing the domestic violence and "he was very much minimizing everything." At trial, Father testified he hit Mother only one time, on both her eyes. He testified he did not hit her arms, chest, or legs, and he did not know how she got the marks there. Father also testified he did not recall having made Mother hold her hands to her side while he beat her.
Father acknowledged that his violence toward Mother endangered the children because it resulted in his arrest, leaving the children in Mother's care, who was unable to properly care for them. One of the purposes of the batterers intervention program was to teach the dangers that domestic violence has on the children. However, at the trial, Father testified he did not believe the domestic violence had any affect on the children. Father also testified that domestic violence in the home was not an issue because Mother no longer lived there.
Much of the testimony concerned Father's ability to make the home clean and safe for the children. At the July 29, 2003 meeting, Father expected the children would be returned to him within three days. Father came to the meeting with photographs of the house showing different rooms in clean, improved condition. Waffen looked at the photographs, told Father she was pleased the house looked so good, and suggested they go examine the house immediately. Father was surprised that Waffen wanted to see the house because he had brought the pictures, and Waffen told him she needed to confirm the accuracy of the photographs. Waffen testified that when she examined the house that day, it was not in acceptable condition. Dangerous problems included a large, uncovered air-vent hole in the wall with exposed wiring into which a child could crawl; the lack of a safety fence around an above-ground swimming pool; and large shards of glass on the floor in front of windows that were missing panes with cardboard taped in place of the panes. The chest of drawers in the children's bedroom was still missing the bottom drawer, and the exposed drawer guides were unsafe. Toys and clothes were strewn about the children's bedroom, and it was not ready to receive children. Waffen *702 was shocked by the condition of the home because Father had insisted he was a clean person and that the condition of the house in August 2002 was Mother's fault. Waffen asked Father how the house could be in such poor condition when he had always represented he kept the house clean, and Father told her, "Well, I was depressed." Father testified that by the time of trial, he had put a fence around the swimming pool and further childproofed the house.
Concerning Father's awareness of Mother's drug problems, Father insisted that he was unaware of Mother's drug problems because he had never been around drugs before; however, he later admitted that his first wife had used marijuana and that he knew something was wrong with Mother. Meinhardt testified that when Mother was sixteen or seventeen years old and living with a drug dealer named Casey, Father would go to Casey's apartment to smoke marijuana.[2] Meinhardt also testified that in 2002, before Father was barred from the house, she saw bags for prescription medicine and empty prescription-medicine bottles all over the house.
Another focus of the testimony was Father's ability to care for the children as a single parent and his understanding of the challenges of being a single parent. There was conflicting evidence as to how much care of the children he took before removal, although the evidence was clear he loved the children and would play with them. During the initial visits after removal, Father had difficulty performing child-care tasks like diapering the children and using Pullups, and he said he did not normally perform these tasks. Father was unaware of child-safety issues like expiration dates on baby-food jars. When the children were removed, they had not been vaccinated. Father told Waffen he trusted Mother to get the children immunized, and he was not concerned about the failure to vaccinate the children. When Waffen asked Father to explain how he planned to manage his own business, which had required long hours, and do all the work necessary to care for the children by himself, he explained to her that he would perform much of the work while the children were asleep. When Waffen asked him to tell her in detail how he was going to do all the work as a single parent, Father would just say, "I will get it done. I will do what I need to do." Because J.M. tested positive for cocaine, Waffen asked him how he would tell if either child had a drug problem, but he could not tell her what signs he would look for indicating a drug problem. Waffen testified Father was unaware the children were developmentally delayed when they were removed, and he did not know what the developmental milestones were for the children. Waffen testified Father had no outside support, such as friends or family, on whom he could call with a problem or question because he did not want his friends or family to know about the children's removal. Father named two cousins in the area he would go to for assistance, but he told Waffen he would not tell them of the situation until after the children were returned to him. At trial, Father testified he had told the two cousins and a friend about the removal; however, by the time of trial, the cousins had moved overseas. Father also testified that his family loved the children and were ready to help him. Father testified that no one could love his children like he could and *703 that he would do what was necessary to care for them.
The foster mother testified she and her husband had cared for the children since August 20, 2002. During the nearly seventeen months before trial, they had seen the children go from being developmentally delayed physically and emotionally to reach their proper developmental level. When the children came into their home, J.M. did not recognize L.M. as his brother, but he came to understand their close relationship. The children had bonded with her and her husband and called them mommy and daddy. The children have met and interacted with the foster parents' relatives. At first, J.M. had nightmares after each visit with Father and Mother, but those subsided after a couple of months.
On the best-interest issue, Waffen testified that termination was in the best interest of the children. She testified that she was "very concerned about [Father's] ability to parent the children, to care for them, and to nurture them." Waffen thought Father was unable to provide the physical and emotional support or the stable and loving environment the children needed. Waffen also testified that one of the issues affecting the best-interest analysis is the length of time it takes the parents to complete the services and whether the parents learn what they are supposed to learn from the services. In this case, it took Father a long time to complete the services, and Waffen testified he did not learn what he was supposed to learn from them, particularly from the batterers intervention program.
The CASA volunteer, Deana Scott, also testified that termination was in the children's best interest. Scott testified, "I'm concerned that the parents, throughout this whole case, have not been able to show us that they have made enough progress to reassure us that they can keep these children safe or that they can provide them a home where they're going to meet their needs." Scott also stated she was concerned whether Father, individually, could provide the children with a safe, loving environment. She also testified that the children, while in the care of the foster parents, had progressed to the appropriate developmental level, had bonded with the foster parents, and had interacted with them and their relatives. Also, like Waffen, Scott was concerned about the length of time it took Father to complete the services and his attitude toward the services.
Father's professional counselor, Debra Pruitt, testified she counseled Father beginning in June 2003 up through the week before trial in February 2004. Throughout the counseling sessions, Father was either in denial of his problems or he minimized them. The only responsibility for the removal of the children Father expressed was not being home enough and not getting help soon enough.
During the weekly counseling sessions, Father told Pruitt generally that he would be able to take care of his children, but when pressed for specific details to show he understood what he was facing as a single parent with no support, having to run a business and provide all the care of the children, he was unable to explain how he would do so and resorted to the simplistic short answers of "I can do this. I will take care of them. I will do what they need." Only in December 2003 did Father begin to admit that he might need help raising the children.
Pruitt also testified that Father denied his house was dirty. When Pruitt confronted him with what Waffen said the condition of the house was during her inspection in July 2003, he denied it was as bad as Waffen represented. Father also *704 refused to admit that the house was dirty before he was barred from the house by the August 2002 protective order.
Concerning the domestic-violence issues, Pruitt testified that Father, at first, denied hitting Mother, but when Pruitt asked how she got the black eyes, he admitted he did hit her because she would not get out of his way. Pruitt also testified that Father did not understand the seriousness of domestic violence and the harm it causes the children. Pruitt testified she would be afraid for children who are returned to a father who had been violent with two wives.
The trial court found: (1) Father knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical and emotional well-being, namely, an environment where illegal drugs could be inadvertently consumed by the children and where acts of violence were committed against Mother while the children were in the household; (2) Father engaged in conduct that endangered the physical and emotional well-being of the children by committing acts of violence against Mother while the children were in the household; and (3) termination of the parent-child relationship between Father and each of the children is in the children's best interest. On appeal, Father does not challenge the trial court's findings that he endangered the children by committing acts of violence against Mother.

EQUITABLE ESTOPPEL
Father asserts for the first time on appeal that the trial court erred in terminating his parental rights because the Department "was equitably estopped to proceed on the termination case." The doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515-16 (Tex.1998). Father asserts the Department falsely misrepresented to him that if he completed the services, then the children would be returned to him. He also asserts the Department concealed from him the material fact that after the January 2003 meeting, it changed its goal from reunification of the family to termination of parental rights and adoption of the children, while knowing that Father would continue to seek the return of his children to his custody. Father asserts he detrimentally relied by continuing to attend the various services required by the Department. The Department asserts it never represented to Father that if he simply completed the services, the children would be returned to him. The Department asserts the record shows Father was repeatedly advised both by the Department and by the trial court that if he could not provide a safe environment for the children, even with the assistance of the service plan, his parental rights could be terminated.[3] The Department also argues Father could not have detrimentally relied because he should have learned of the *705 change in the permanency plan in February 2003.[4]
Estoppel is an affirmative defense that must be pleaded. See Tex.R. Civ. P. 94; In re S.A.P., 156 S.W.3d 574, No. 04-0473, 2005 WL 119935, at *2 (Tex. Jan.21, 2005) (per curiam). "If estoppel is not pleaded, it is waived." In re S.A.P., at 576, 2005 WL 119935, at *2. Father acknowledges he did not affirmatively plead estoppel,[5] but he argues the issue was tried by consent. Rule 67 of the Texas Rules of Civil Procedure provides that when issues not raised by the pleadings are tried by implied consent, they must be treated in all respects as if they had been raised in the pleadings. Tex.R. Civ. P. 67; see Johnson v. Structured Asset Servs., LLC, 148 S.W.3d 711, 719 (Tex.App.-Dallas 2004, no pet.). This rule is limited to those exceptional cases where it clearly appears from the record as a whole that the parties tried an unpleaded issue by consent. Gutierrez v. Gutierrez, 86 S.W.3d 721, 729 (Tex.App.-El Paso 2002, no pet.). It does not apply when the evidence of the unpleaded matter is relevant to the pleaded issues because it would not be calculated to elicit an objection. RE/MAX of Tex., Inc. v. Katar Corp., 961 S.W.2d 324, 328 (Tex.App.-Houston [1st Dist.] 1997), pet. denied, 989 S.W.2d 363 (Tex.1999); Austin Area Teachers Fed. Credit Union v. First City Bank  Northwest Hills, N.A., 825 S.W.2d 795, 800 (Tex.App.-Austin 1992, writ denied). To determine whether an issue was tried by consent, the reviewing court must examine the record, not for evidence of the issue, but rather for evidence of trial of the issue. Johnson, 148 S.W.3d at 719; Gutierrez, 86 S.W.3d at 729.
The doctrine of trial by consent does not apply for two reasons. First, assuming, without deciding, that there is evidence of equitable estoppel, we conclude the record does not show the issue was tried. Father did not refer to equitable estoppel, either expressly or implicitly, at any time in the trial record. The issue was not mentioned in any pretrial or posttrial pleading or motions, and it was not mentioned during the opening statements, presentation of the evidence, or in the closing arguments. The trial court did not make, and Father did not request, a finding of fact or conclusion of law on equitable estoppel. Second, any evidence that could possibly relate to the doctrine of equitable estoppel was also relevant to the issue of whether termination was in the best interest of the children. Because equitable estoppel was not pleaded or tried by consent, we conclude it was waived. In re S.A.P., 2005 WL *706 119935, at *2.[6] We resolve Father's first issue against him.

BEST INTEREST
In his second issue, Father asserts the evidence was legally and factually insufficient to establish by clear and convincing evidence that termination of Father's parental rights was in the children's best interest. The finding that termination was in the children's best interest must be supported by clear and convincing evidence. Tex. Fam.Code Ann. § 161.001(2) (Vernon 2002). Whether analyzing a legal or factual sufficiency challenge, the critical inquiry is whether, based on the trial evidence, a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. In re S.A.W., 131 S.W.3d 704, 708 (Tex.App.-Dallas 2004, no pet.). In a legal sufficiency review, we view the evidence in the light most favorable to the judgment, disregarding only the evidence that a reasonable factfinder could have disbelieved or found to have been incredible. Id. When reviewing the evidence for factual sufficiency, we must give due consideration to evidence the factfinder could reasonably have found to be clear and convincing, reversing the judgment only, if in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that it could not have formed a firm conviction or belief. Id.
In determining whether termination is in the children's best interest, we consider several factors, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of those seeking custody; (5) the programs available to assist those individuals or by the agency seeking custody; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent indicating the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). We will consider each of these factors.
The desires of the children. The children did not testify and are too young to express their desires on this issue, but the evidence shows they are bonded to both Father and the foster family, enjoy their visitations with Father, and are happy in the foster home.
The emotional and physical needs of the children. The record shows Father lacked an understanding of the responsibilities of childcare. Some witnesses testified that Mother performed most of the childcare before removal. Father testified that he shared in much of the childcare before removal, including changing diapers and bathing and feeding the children; however, at the visitation sessions, he had difficulty changing diapers and using Pullups and admitted he normally did not perform those tasks. Father's credibility was suspect due to the evidence of his lies to Waffen and others involved with the Department about the condition of the house, *707 whether he had committed domestic violence,[7] and other issues.[8] When asked by Waffen to explain in detail how he would care for the children, Father answered in generalities, stating he would do whatever was necessary. Father was unaware of the developmental milestones for the children, and the children were developmentally delayed while in his care before removal. Evidence also showed Father lacked outside support, something the trial court could consider was important for a single parent. This lack of support was due to Father's shame of admitting the Department's involvement to his family and friends. Father testified that his family was ready to help him, but as his family was in Jordan and none of them testified, the trial court could conclude his testimony was not credible. As Waffen testified, Father was in denial of the problems that led to the removal of the children. Even when he admitted some problems, like domestic violence and the dangerous condition of the house, he minimized their importance and blamed the problems on others. The trial court could conclude that Father's refusal to accept and understand his part in the problems leading to the children's removal raised a likelihood that those problems would arise again.
The emotional and physical danger to the children. The physical danger to the children now and in the future is shown by Father's inability to keep a house safe for the children. On July 29, 2003, Father represented to Waffen through pictures he presented that the house was safe for the children. Waffen testified the house presented many dangers and was not prepared to receive the children. Father testified at trial that the house was, at that time, ready to receive the children, but given his lies to Waffen on this subject, the trial court could disbelieve Father's testimony. The emotional danger to the children is shown by Father's attitude toward domestic violence. After completing the batterers intervention program, Father still believed that the only risk to his children from his abuse of his wives was that he might be arrested and removed from the household. Father did not believe domestic violence could have any affect on the children. This belief was contrary to what he was taught in the batterers intervention program and contrary to what other witnesses testified was the affect on children. During the closing argument, the trial court stated that Father's argument that acts of domestic violence do not constitute allowing the children to be in an environment endangering them "seems spurious."
Father testified that his past violence would not be an issue in the future because Mother no longer lived in the house and he had completed an anger-management course as one of the services required by the Department. However, he had previously completed some type of anger management program after his arrest for hitting his first wife. Given Father's history of physically abusing his first two wives, *708 and the fact he abused Mother after he had taken a class dealing with anger issues, the trial court could conclude that domestic abuse would again become an issue.
The parental abilities of those seeking custody. The foster parents who plan to adopt the children demonstrated their parental abilities through their raising the children during the more than sixteen months they cared for the children before trial. The children were developmentally delayed when they were placed with the foster parents. J.M. also seemed not to recognize that L.M. was his brother. During their time with the foster parents, the children quickly reached the proper developmental levels. The foster parents also saw to it that the children bonded to each other as brothers. The children also took part in activities with the foster parents' extended family.
The trial court could conclude that Father's parental abilities were not as good. He admitted during visitations that he was not used to changing diapers. Waffen testified that Father did not understand about expiration dates on baby-food jars. Another indication of his lack of parental abilities was demonstrated by Father's shortcomings in disciplining the children during visitations. During one visitation, L.M. picked up a piece of paper and put it in his mouth. Mother said the paper should be taken from L.M., but Father told her, "no, it's okay. It's okay. He can eat paper." As Waffen testified, "He wasn't at all concerned the baby was going to put something in his mouth." Father's general and superficial responses to Waffen's inquiries about child-care issues also indicates his lack of parental abilities. Likewise, the failure to immunize the children, his delegating all responsibility on this issue to Mother, and his lack of concern about immunizations indicates a lack of parental abilities.
The programs available to assist those individuals or by the agency seeking custody. The record contains no evidence on this factor.
The plans for the child by these individuals or by the agency seeking custody. The foster mother testified that she and her husband want to adopt the children. Father testified that if the children are returned to him, he would raise the children on his own. He testified that almost all of his family members are willing to come and help him. As discussed above, however, the trial court could conclude Father lacked credibility.
The stability of the home or proposed placement. The evidence shows the foster parents' home is stable. By the time of trial, the children had been in the foster parents' care for over seventeen months, and the children thrived in their care. Both foster parents work, and the children are placed in daycare during the day. Father plans to raise the children as a single father. Before the trial, Father often worked long hours operating his own business. After removal, Father's work schedule sometimes interfered with his meeting with Waffen. Father testified he planned to reduce his hours so he did not work nights and weekends.
The acts or omissions of the parent indicating the existing parent-child relationship is not proper. This behavior includes Father's abusing Mother. Father's behavior in delaying completing the services and his persistent denial of responsibility for the children's removal delayed the possible return of the children to Father. Also, Father's behavior since the children's removal has been a pattern of deception and manipulation in which he demonstrated he would say anything, regardless of its truth, to obtain the return of his children, which shows he cannot be *709 trusted to do what he says he will do. Father's history of domestic violence toward his two ex-wives, together with his refusal to accept the concept that domestic violence harms the children, shows the children would not be safe in the home with him.
Any excuse for the acts or omissions of the parent. Father testified his lack of familiarity with the English language may have resulted in him not understanding some of what he was told as well as resulting in him not being able to verbally express what Smith, Waffen, Pruitt, and Scott wanted to hear. Father testified that he knew it was wrong to hit his wife, and he insisted that it had no harmful effect on the children.
Father relies on two published opinions to support his argument that the evidence does not support the finding that termination is in the children's best interest.[9] The first case is not applicable because it concerns only the sufficiency of the evidence to support the finding that the appellant endangered his children; the opinion does not discuss the issue in this case, the sufficiency of the evidence to support the issue of whether termination was in the children's best interest. See Doria v. Tex. Dep't of Human Resources, 747 S.W.2d 953, 958-59 (Tex.App.-Corpus Christi 1988, no writ). The second case, In re W.C., 98 S.W.3d 753 (Tex.App.-Fort Worth 2003, no pet.), concerned the factual sufficiency of the evidence to support the best-interest finding when the mother had successfully completed all the services the Department required and had made substantial progress under the services. Id. at 766. As the Fort Worth Court explained,
[T]he Department based its termination decision on its belief that appellant's past conduct and poor judgment still posed a risk of harm to the children. The evidence shows, however, that appellant has made significant progress, improvements, and changes in her life, and her insights and coping skills have improved, as well as her relationship with her family. The evidence also shows appellant and the children are bonded with one another, that appellant visits her children regularly, and that she obviously cares for her children. There is also evidence the children are making progress through therapy and that appellant has gained a good support system through her family and church. The record reflects there is nothing more appellant could have done in order to have her children returned.
Id. Father, unlike the mother in In re W.C., has not made significant improvements. The trial court could conclude that Father lied to the Department, his counselor, and in his testimony to the court about the extent of the domestic violence in which he had engaged. The court could also conclude from the evidence that domestic violence in the home is harmful to children and that Father's testimony that he did not believe the children were harmed by his domestic violence shows the children would be subject to future emotional danger in his care.
Also, unlike In re W.C., the trial court could conclude Father did not have a good support system. Father testified that the only people he had told about the removal had since moved overseas. Father told Waffen and Pruitt he did not want his *710 family to know about the removal because he was ashamed. The only other member of Father's family who knew of the removal was his sister who flew over from Jordan to visit him; however, he told her not to tell their mother, and the record does not show whether he or his sister told anyone else. Although Father testified that his family was ready to help him, the trial court could discredit his testimony based on Father's pattern of lying throughout this case. Furthermore, with Father's family living in Jordan, they were not immediately available to help him. Father testified he had "a lot of friends" he could turn to for help, but the only "friend" who testified on his behalf was a woman who ran a 24-hour daycare and testified she would accept the children at her daycare. We conclude In re W.C. is distinguishable.
After reviewing all the evidence under both the legal and factual sufficiency standards, we conclude the trial court could reasonably form a firm belief or conviction that termination of the parent-child relationship between Father and his two sons was in the children's best interest. We resolve Father's second issue against him.
We affirm the trial court's judgment.
NOTES
[1] In July 2003, Father suggested the Department do a home study on his family in Jordan. By this time, the children had already been in foster care for about 11 months. Even if placement and monitoring by the Department in a foreign country were possible, it is not clear how such a placement would have allowed greater visitation because Father's home and business were in Texas.
[2] Mother testified that Casey was not a drug dealer and that she did not smoke marijuana with Father at Casey's apartment.
[3] At a hearing on October 9, 2002, the trial court told Mother and Father, "And the Court further must advise each of the parents that unless you are willing and able to provide your children with a safe environment, even with the help of a service plan, your parental rights could be further restricted or even terminated." The trial court similarly admonished Mother and Father on August 23, 2003 that their parental rights could be terminated despite the assistance of the service plan if they could not provide the children with a safe environment within a reasonable amount of time.
[4] In accordance with section 263.303 of the Texas Family Code, the Department filed periodic Permanency Plan and Permanency Progress Reports. See Tex. Fam.Code Ann. § 263.303 (Vernon 2002). In the October 1, 2002 Permanency Plan and Permanency Progress Report, the Department stated that the permanency plan for the children was "Family Reunification." The January 27, 2003 Permanency Plan and Permanency Progress Report, the Department changed the permanency plan for the children from "Family Reunification" to "Permanent Placement with non-relative." The May 15, 2003 and July 9, 2003 Permanency Plan and Permanency Progress Reports stated that the permanency plan for the children was permanent placement with a non-relative through adoption. The Department argues Father should have learned of the change in the permanency plan in February 2003 because, according to the Department, Father hired counsel in February 2003 who could have explained the change in the permanency plan to him. The record does not show when Father hired counsel. Our review of the record shows the first time Father may have appeared with counsel was at the May 15, 2003 hearing.
[5] Father's answer is not in the appellate record. However, at submission of the cause, his attorney represented to the Court that Father's answer consisted of a general denial.
[6] We also observe that, even if pleaded or tried by consent, like the supreme court, "we have difficulty imagining how parents found ... to have endangered their children can have the `clean hands' needed" for estoppel. In re S.A.P., at 577, 2005 WL 119935 at *2. We also share the supreme court's concern as to how Father's "participation in counseling and other family support services was detrimental. It is hard to see how [Father's] chances of regaining custody of [his children] would have been increased by refusing to do so." Id. at 577, at *3.
[7] Father asserts he could not admit to the domestic violence because he had charges pending at the time. Father testified that his criminal-defense attorney advised him to refuse to answer question about domestic violence and to refer the questioner to the attorney. Father, however, failed to follow this advice when he repeatedly denied having committed domestic violence.
[8] Father also testified he understated his income on the batterers intervention program intake form in order to be able to participate in the program for the least amount of fees. On examination by his own attorney, however, he testified that the income level was stated correctly. The trial court could conclude that Father would say anything, regardless of its veracity, to achieve his goal of the return of the children.
[9] Father also cites an unpublished opinion from this Court, Michael C. v. Texas Department of Protective & Regulatory Services, No. 05-96-01867-CV, 1998 WL 209055 (Tex.App.-Dallas Apr. 30, 1998, pet. denied) (not designated for publication). That opinion discussed only the issue of whether the parents' endangered their children; the opinion did not reach the best-interest issue. Accordingly, it is not applicable to this case.