

# NUMBER 13-22-00415-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.Y.A., R.D.A., AND J.A.A., CHILDREN

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Adam appeals the termination of the parent-child relationship between him and his children Andrew, Roman, and Jacob, following a suit brought by appellee the Texas Department of Family and Protective Services (Department).[1] By a single issue, Adam argues the evidence was legally and factually insufficient to support the trial court's

---

[1] We refer to the children and their relatives by aliases in accordance with the rules of appellate procedure. See TEX. R. APP. P. 9.8(b)(2).

finding that termination was in Andrew, Roman, and Jacob's best interest. We affirm.

## I. BACKGROUND

This case involves two separate suits that were consolidated into one single suit. Veronica gave birth to Jacob in November 2019.[2] The Department filed an original petition seeking emergency temporary managing conservatorship of Jacob, alleging that remaining in the care of his parents would endanger his physical health or safety. In support of its petition, the Department included an affidavit by an investigator that alleged, among other things, that Jacob and Veronica both tested positive for amphetamines and methamphetamines at the time of Jacob's birth. As to Adam, the Department alleged that he was believed to be a member of a known gang, had a history of drug use, refused to drug test for the Department, and had a conviction for assault against a family member, among other criminal charges and convictions. The trial court granted the Department's request for an emergency order on November 15, 2019, and appointed it as the temporary managing conservator of Jacob.

On November 25, 2019, the trial court held an adversary hearing where it extended the Department's temporary managing conservatorship over Jacob. The Department created and filed a family plan of service for Adam that required him to: (1) attend, participate, and complete parenting classes; (2) attend, participate, and complete individual counseling; (3) complete a drug assessment and follow the recommendations made by the provider; and (4) attend and participate in a batterer's intervention and

---

[2] Veronica is not a party to this appeal. We thus focus our review of the facts as they relate to Adam.

prevention program.

On October 26, 2020, the trial court extended the dismissal deadline from November 16, 2020, to May 15, 2021. *See* TEX. FAM. CODE ANN. § 263.401(b). The trial court again extended the dismissal deadline on April 26, 2021, until September 2, 2021. A docket entry by the trial court cited a "COVID extension." *See Thirty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 897, 897 (Tex. 2021) (permitting the trial court to extend the dismissal deadline under § 263.401 for an additional 180 days); *see also In re O.O.*, No. 13-21-00411-CV, 2022 WL 1559725, at *8 (Tex. App.—Corpus Christi–Edinburg May 17, 2022, pet. denied) (mem. op.) (holding that a trial court's notation of an extension in its docket sheet was sufficient to maintain jurisdiction). On August 23, 2021, the trial court yet again extended the dismissal deadline to December 1, 2021. *See Fortieth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 911, 912 (Tex. 2021) (permitting the trial court to extend the dismissal deadline under § 263.401 no later than December 1, 2021).

On June 9, 2020, the Department filed an original petition seeking emergency temporary managing conservatorship of Andrew (born September 2015) and Roman (born October 2018), alleging that remaining in the care of their parents would endanger their physical health or safety. The affidavit in support of removal alleged that Adam was arrested for aggravated assault with a deadly weapon and other charges, including child endangerment, on June 6, 2020. According to the affidavit, Adam and another passenger chased some individuals in a vehicle while Adam's passenger exhibited a firearm. After law enforcement arrived, they located the firearm in the glovebox as well as a small

3

baggie of black tar heroin. Andrew and Roman were in the vehicle during the incident. The trial court granted the Department's request for an emergency order on June 11, 2020, and appointed it as the temporary managing conservator of Andrew and Roman.

As in Jacob's case, on April 26, 2021, the trial court granted an extension for Andrew and Roman's case until September 2, 2021. *See In re O.O.*, 2022 WL 1559725, at *8; *see also Thirty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d at 897. And as in Jacob's case, on August 23, 2021, the trial court granted an additional extension until December 1, 2021. *See Fortieth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d at 912. On November 15, 2021, the trial court signed an order consolidating Andrew and Roman's case into Jacob's case.[3]

A bench trial commenced on November 30, 2021, but following argument by the parties, was recessed until May 24, 2022, pursuant to Texas Family Code § 263.4011. *See* TEX. FAM. CODE ANN. § 263.4011. The trial court heard evidence on November 30, 2021; February 18, 2022; May 24, 2022; June 30, 2022; and July 12, 2022. On August 30, 2022, the trial court signed an order terminating the parent-child relationship between Adam and his three children. This appeal followed.

## II.    BEST INTEREST OF THE CHILDREN

### A.    Standard of Review

"[I]nvoluntary termination of parental rights involves fundamental constitutional rights" and divests the parent and child of all legal rights, privileges, duties, and powers

---

[3] Veronica gave birth to a fourth sibling during the pendency of this case. Although he was also removed through a suit by the Department seeking to terminate the parent-child relationship, his case was not consolidated into this case. All four children were placed together.

4

normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1)(A)–(U) (predicate grounds); and (2) termination is in the child's best interests. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the factfinder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be

5

incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination "if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266). Under the factual sufficiency standard, we defer to the factfinder's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)); *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

"In a bench trial, the trial court acts as the fact[]finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "The fact[]finder may choose to believe one witness over another, and we may not impose our own opinion to the contrary." *Id.* (citing *Nguyen*, 355 S.W.3d at 88).

## B. Applicable Law

"The best-interest prong of the termination inquiry 'is child-centered and focuses

6

on the child's well-being, safety, and development.'" *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d at 631). The Texas Supreme Court has identified several nonexclusive factors for courts to consider in determining the child's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the children's desires; (2) the children's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the children; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the children's best interest; (6) the plans for the children by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and (9) any excuse for the parent's acts or omissions. *Id.* at 371–72. Evidence that is probative of grounds for termination may be probative of the best interest of the child, as well. *In re C.H.*, 89 S.W.3d at 28.

## C. Analysis

Adam does not challenge the trial court's finding of predicate grounds (D) (endangering the children through conditions or surroundings), (E) (endangering children through conduct), (N) (constructively abandoning the children), (O) (failing to comply with the family plan of service), and (P) (using a controlled substance and failing to complete court-ordered substance abuse treatment program). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (P). Rather, Adam argues that the evidence was legally and factually insufficient to support the finding that termination of the parent-child

7

relationship was in Andrew, Roman, and Jacob's best interests. Accordingly, we review the evidence regarding the *Holley* factors.

### 1.    The Children's Desires

When children are too young to appropriately express their desires, a court may consider the quality and extent of the children's relationship with the prospective placements. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (considering evidence that children were bonded to foster family, were happy in foster home, and enjoyed visitation with father in assessing young children's desires); *see also In re R.E.S. III*, No. 13-10-00132-CV, 2011 WL 2475926, at *3 (Tex. App.—Corpus Christi–Edinburg June 23, 2011, no pet.) (mem. op.) (considering evidence that mother did not visit children for over three years). The Department's conservatorship worker, Tanisha Bennett, testified that Adam did not visit the children for a period of seven months in 2021 and into 2022. Although Bennett acknowledged part of the lack of visitation was due to bond conditions placed on Adam after an arrest, she noted that the bond conditions did not prohibit his visitation during that seven-month period.[4] On the other hand, Jacob had been in the same foster placement for 725 days, while Andrew and Roman had been there for 505 days. Additionally, the children call their foster parents "mom" and "dad." *See In re J.M.*, 156 S.W.3d at 706; *see also In re R.T.*, No. 09-15-00425-CV, 2016 WL 821844, at *8 (Tex. App.—Beaumont Mar. 3, 2016, no pet.) (mem. op.) (considering evidence that young child referred to his foster parents as "Papa" and "Momma"); *In re*

---

[4] Although Bennett acknowledged that Adam's bond conditions prevented him from visiting, it is unclear precisely when the bond conditions prohibited him from visiting his children, but he testified that they were modified "16 [or] 17 months after the fact."

8

*R.E.S. III*, 2011 WL 2475926, at *3.

All three children were under the age of six at the time of trial. Although the children may not entirely comprehend their options, Bennett testified that Andrew has said he wanted to stay with his foster family "forever." The children's guardian ad litem, Liz Donato, testified that Roman refers to both his foster dad and Adam as "dad," refers to both positive and negative memories of Adam and desires to go fishing with Adam and to ride horses with his foster dad. *See In re J.M.*, 156 S.W.3d at 706. Jacob was too young to articulate his desires. However, the totality of the evidence supports a finding that the children desired to remain with their foster family, which supports termination. *See In re A.M.*, 418 S.W.3d at 841; *see also In re J.M.*, 156 S.W.3d at 706; *In re R.T.*, 2016 WL 821844, at *8; *In re R.E.S. III*, 2011 WL 2475926, at *3.

### 2. The Children's Present and Future Emotional and Physical Needs and the Present and Future Emotional and Physical Danger to the Children

We consider the children's present and future emotional and physical needs and present and future danger to the children together. The record did not contain any evidence of any special or exceptional emotional or physical needs of the children. There was, however, evidence of emotional and physical danger to the children. *See In re C.H.*, 89 S.W.3d at 28; *see also In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *12 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) ("The unchallenged predicate findings under [§] 161.001(1)(E), endangering conduct, are binding and may be considered as evidence related to the court's best interest finding."). For example, Roman and Andrew were removed because Adam took the children with him and another

9

individual to allegedly collect drug money, using a firearm.[5] While searching the vehicle where Roman and Andrew were present, law enforcement found what they believed to be black tar heroin and a firearm. The evidence revealed that Adam was a member of the Texas Syndicate, a known gang. *See In re A.M.*, No. 13-12-00767-CV, 2013 WL 1932903, at *23 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, no pet.) (mem. op.) (holding that a factfinder could conclude dad's affiliation with a gang was a danger to the children). Further, although Andrew was being cared for by a relative while Adam was at work, he was found wandering the streets alone and unsupervised at age four. Lastly, there was evidence of Adam's continued methamphetamine use throughout the case, which was the basis of Jacob's removal. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). Accordingly, the evidence as to the children's present and future emotional and physical needs and emotional or physical danger to the children supports termination.

### 3. The Parenting Abilities of the Individuals Seeking Custody of the Children, the Programs Available to Assist Those Individuals, Stability of the Proposed Placement, and Future Plans for the Children

We consider the abilities of the individuals seeking custody of the children, the programs available to assist those individuals in promoting the children's best interest, the stability of the proposed placements, and the future plans for the children together. The children's foster dad testified that he and his wife have provided a home for Andrew and Roman for over 500 days and for Jacob for over 700 days. During that time, the

---

[5] The police report from the alleged incident was admitted as an exhibit during trial.

10

children bonded with their foster family,[6] established a daily routine, and received "love and affection" from their foster family. Further, the foster dad testified that the home is free of drug, gang, and criminal activity. Foster dad explained that he and his wife have sufficient financial resources to provide care for the children, as well as extended family to assist in providing care for the children. The children regularly attended doctor's appointments while in the foster family's care. Foster dad asserted that, if provided the opportunity, he and his wife would adopt the children.

Adam requested the trial court to return the children to him. In the alternative, Adam requested the trial court place the children with his adult daughter. Adam testified that he believes he can provide care for the children because he "did it last time." According to Adam, he was previously given custody of Andrew and Roman and would allow their mother to visit them in public places. Adam explained that he owns a business doing residential and commercial remodeling, demolition, and painting. As it related to his arrest with his children, Adam averred that he was only giving the other gentleman a ride, which he regrets. Adam denied using drugs since the inception of this case but acknowledged a history of marijuana and methamphetamine use. Adam testified that he planned to get a two- or three-bedroom house for his children, but subsequently acknowledged that he was evicted from his most recent residence a week prior.

Adam stated that he believed it was important for his children to be aware of their Hispanic cultural background. Foster dad, on the other hand, testified that he did not think

---

[6] The foster dad testified that he and his wife previously adopted another child and were also fostering Jacob, Andrew, and Roman's youngest sibling.

maintaining their cultural identity was "that important" but explained he would not discourage the children from pursuing their cultural identity. Further, foster dad explained that the children currently attend an Amish parochial school, which they would attend through the eighth grade. Foster dad did not believe the children needed to attend school beyond the eighth grade. In contrast, Adam believed it would be in the children's best interest that they obtain a high school diploma.

Bennett testified that although Adam completed a drug treatment program,[7] he subsequently tested positive for drugs. According to Bennett, Adam failed to complete his family plan of service, pointing out that Adam provided eight positive hair follicle drug tests and failed to appear for twenty-seven drug tests. Bennett explained that Adam moved back and forth between different homes throughout the case and that his most recent home was devoid of appliances such as a stove and refrigerator, and a portion of the roof was caved in. Further, Robert Rios, a psychologist who evaluated Veronica, testified that she disclosed that Adam perpetrated physical violence against her. Adam had a prior conviction for assault family violence in 2009 and was arrested for allegedly assaulting Veronica in 2020.

The children's adult sister, Abigail, testified that she had a prior relationship caring for Roman and Andrew and was "very close" with them. Abigail clarified that she did not have the opportunity to bond with Jacob because he was removed from his parents' care when he was born, but she did attempt to get placement of him when he was removed.

---

[7] Michelle Smith, a drug treatment counselor with the Council on Alcohol and Drug Abuse Coastal Bend, testified that Adam was assigned to her caseload, but did not complete the program with her. Smith explained that Adam may have completed outpatient services with another provider.

12

Abigail explained that the attempt was denied because she was only eighteen years old and had a pending felony charge for manufacturing and delivering a controlled substance.[8] In addition, Abigail has her own one-year-old child in her home. Abigail was not employed at the time of trial but said she was able to provide for her son by dog sitting, reselling items, and by receiving government assistance. Abigail further explained that she received money from her brother's life insurance when he passed away. Abigail stated that, although she is ready for the children to be with her now, she would likely seek a three-bedroom home instead of her current two-bedroom home.

Children's education is paramount to their well-being and success. Indeed, courts may consider whether a child's education needs are being met when determining if an individual's future plans for the children support termination. *See In re J.W.*, 645 S.W.3d at 746; *see* also *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *28 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (considering mom's plan to homeschool children despite only having received an eighth-grade education herself). So, too, may a court consider the children's cultural ties and their ability to experience such with their foster family. *See In re J.W.*, 645 S.W.3d at 746; *see also E.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *10 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.) (considering a foster mother's testimony that she understood the importance of cultural ties). Thus, the trial court could conclude that the foster dad's testimony regarding the children's education and cultural ties may be a detriment to the children. However, the trial court could have determined that Adam's

---

[8] The criminal charge was not resolved at the time of trial.

housing instability—coupled with his criminal, drug, gang, and domestic violence history—presented more of a detriment to the children than they would be exposed to with the foster family. *See In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.) ("A parent's inability to provide adequate care for her child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests."). Further, although the foster dad testified that he did not believe it was "that important" for the children to maintain their cultural identity, he stated that he would not discourage them from doing so. *See In re J.W.*, 645 S.W.3d at 746; *see also In re K.S.O.B.*, 2019 WL 1246348, at *28.

Although the Department provided Adam with services to treat his drug addiction, he continued to use drugs throughout the case and failed to take more than two dozen drug tests. *See In re C.H.*, 89 S.W.3d at 28; *see also In re T.R.L.*, No. 10-14-00290-CV, 2015 WL 1020865, at *5 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."). Despite Adam's testimony that he would be able to obtain housing for himself and his children, the trial court could have discounted this testimony, especially based on his residential instability throughout the case and recent eviction. *See In re A.M.*, 418 S.W.3d at 841. The trial court could have also taken into account that Andrew was found wandering the streets alone at the age of four after Adam left him with a family member, demonstrating Adam's history of leaving the children in an environment or with persons who endanger their emotional or physical health. Lastly, the trial court could have concluded that Abigail was not a suitable placement based on her pending felony

14

indictment and negative home study. Considering the totality of the evidence, these factors weigh in favor of termination.

### 4. The Parent's Acts or Omissions that May Indicate the Existing Parent-Child Relationship is an Improper One and Any Excuse to the Parent's Acts or Omissions

Jacob was removed from his parents' care due to their ongoing drug use. When asked about it, Adam explained that he used marijuana and methamphetamine to celebrate his birthday shortly before Jacob was born but called his decision a "mistake." *See In re N.L.D.*, 412 S.W.3d at 819. Although Adam denied using any other drugs since Jacob's removal, he provided multiple positive drug tests and failed to appear for several others. *See In re T.R.L.*, 2015 WL 1020865, at *5. As to his arrest that led to the removal of Andrew and Roman, Adam explained that he was merely giving an old acquaintance a ride after seeing him during a trip to the store to buy milk. Adam further denied that he or his acquaintance pointed a firearm at anybody or that they chased anybody in his vehicle. However, the trial court was free to disbelieve Adam's explanation. *See In re A.M.*, 418 S.W.3d at 841. Similarly, although Adam testified that he was no longer involved with the Texas Syndicate, the trial court could have similarly disbelieved this claim. *See id.*; *see also In re A.M.*, 2013 WL 1932903, at *23. These factors weigh in favor of termination.

### 5. Summary

The evidence at trial demonstrated that Adam has an extensive criminal history, continued to use methamphetamine throughout the case, failed to complete his family plan of service, demonstrated housing instability, and did not visit his children for several months at a time. On the other hand, even though the foster parents do not intend to

enroll the children in high school, the children were thriving at the time of trial in their foster placement, and the foster parents wish to adopt them. We conclude that the evidence was legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in the best interest of each child. Adam's sole issue is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
23rd day of February, 2023.