# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00621-CV

---

**J. C., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 424TH DISTRICT COURT OF BURNET COUNTY
NO. 51642, THE HONORABLE CHERYLL MABRAY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant J.C. ("Mother") appeals from the trial court's order terminating her parental rights to her son "Charles," who was born in October 2019 and was about two-and-a-half years old at the time of the de novo hearing in June 2022.[1] Mother challenges the legal and factual sufficiency of the evidence supporting the court's findings on best interest and of statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). We affirm the trial court's order of termination.

---

[1] For the child's privacy, we will refer to him by an alias and to his family members by their relationships to him. *See* Tex. R. App. P. 9.8. Charles's father's rights were also terminated, but although he filed a notice of appeal, he later filed a motion to dismiss explaining he did not wish to proceed.

## FACTUAL AND PROCEDURAL SUMMARY

According to a November 2020 affidavit filed by the Texas Department of Family and Protective Services, Mother had been involved with the Department in the past; her parental rights to her two older children had been terminated; and the present case began after Mother tested positive for methamphetamine.[2] In December 2020, it filed an amended petition seeking conservatorship, attaching another affidavit describing its repeated unsuccessful efforts to find Mother and Charles and explaining that Charles was eventually located with Mother when she was arrested on a warrant during a traffic stop. Charles was taken into the Department's care under an emergency order signed December 7, 2020. A five-day hearing before an associate judge began in December 2021 and concluded in May 2022,[3] followed by a June 2022 de novo hearing in which the court took judicial notice of the evidence from the associate-judge hearing.

Department caseworker Kyle Ricketson testified in the first two days of the hearing. He explained that the Department had conducted prior investigations, that Mother had "previously had a family based services case," that the Department filed this case in December 2020 after Mother tested positive for methamphetamines, and that before seeking removal, the Department searched for the child for thirty to forty-five days. Charles was taken into Department care when Mother was arrested on a warrant after a traffic stop, and Mother and Charles both tested positive for methamphetamine in hair-follicle tests administered early in the proceeding. Mother's service plan required her to take random drug tests; complete a

---

[2] The Department did not introduce its petitions or affidavits into evidence, although the associate judge did take judicial notice of all its orders and the docket sheet. We refer to those documents here only to the extent necessary to understand the context and timeline of the case.

[3] The hearing before the associate judge took place on December 7, 2021, February 15, 2022, April 19, 2022, May 3, 2022, and May 19, 2022.

psychological evaluation; engage in therapy that included parenting training; complete a parenting class; discontinue contact with "dangerous or known criminals that are engaging in illegal or dangerous activity"; and obtain and maintain stable housing.

Ricketson testified in February that he had obtained a copy of an earlier psychological evaluation conducted through drug court but that mother had not completed an evaluation for the Department. Mother initially engaged in therapy and largely took drug tests as requested, and except for the initial positive hair-strand test and a March 2021 urinalysis (UA) that was positive for morphine, her other UAs were negative; Mother claimed not to have used morphine but did not provide any medications or other explanations for the positive result. Mother had missed several drug tests, not all of which were requested while she was incarcerated; she was unsuccessfully discontinued from a drug-court program; and she was dropped by her therapist in April 2021 "[d]ue to her inability to trust and appropriately participate within the service."

Ricketson testified that Mother had last seen Charles in July 2021. Before that, she had been seeing Charles regularly at visitations, but in May or June 2021, Mother's supervision through drug court was revoked "due to continued engagement with dangerous and illegal activities." She was released from jail in mid-December 2021 and gave birth to a daughter, "Opal," on December 28, 2021. She had restarted drug testing after her release and had started therapy with a new provider in early February. Ricketson had visited a residence where Mother claimed to live but was unable to confirm that she was actually living there because she could never meet him at the home to confirm her residence. Mother claimed to be employed but had not provided any proof of employment, and Ricketson had not "successfully spoken to anybody at the travel center where she claims to [work]."

3

Ricketson agreed that Mother had largely been working her service plan since being released from jail in December 2021, other than when she was at the hospital after giving birth. However, he had concerns about allegations of physical violence with her ex-boyfriend, "Henry," explaining that when Mother was nine months pregnant with Opal, an incident occurred in which both Mother and Henry accused each other of assault, with Henry alleging she had tried "to run him over with a car." Henry had also reported to the Department that Mother is not a suitable parent, that she would subject a child to an environment that "would be dangerous and detrimental to his health," and that she continued to associate with inappropriate individuals who are drug users. Ricketson believed Mother had lied to the Department about "the involvement of dangerous activities and inappropriate activities with individuals and places that would be looked at as inappropriate."

Ricketson testified that Mother's "reoffending and getting arrested" caused instability for Charles and "a dangerous and chaotic environment for the child, especially one of such a vulnerable age. You're not there to take care of the child or the child is shuffled around." He believed termination was in Charles's best interest because the child "needs a safe and healthy, functioning environment for him to thrive and grow in. And unfortunately I see the struggle [Mother] has with being able to provide that and that causes concern." Charles was "doing awesome" in his foster home, which is meeting his needs, and is bonded with the family members. Ricketson testified that Charles is "very engaged, very comfortable, confident with" his foster family and that the placement is "in it for the long haul" and hopes to adopt him.

Counselor Deborah Taber testified that she first worked with Mother in a 2020 protective-parenting class, and that in January 2021, Mother was referred to her for individual counseling and parenting classes in the present case. They started therapy in February 2021, but

4

Mother was unsuccessfully discharged because she had missed three sessions or "was always in the midst of something [that] was going on that she couldn't come or couldn't finish a session, couldn't complete it." Taber discharged Mother after Mother claimed she had gotten a last-minute call requiring her to attend a probation meeting, but the probation officer said that the meeting had "been set for some—for at least two or three weeks." Taber said that Mother "had not been honest with me in telling me that it was last minute, and so I did not—I didn't want to continue with her." Taber believed "truthfulness is an issue" for Mother, who had given inconsistent explanations about whether she was in a relationship and with whom, and said that "there was just a lot of chaos, a lot of my wondering how really honest she was."

Taber testified that Mother had addressed many of the same issues a year earlier in the parenting class—"about being around people that were using drugs, about choosing men, about domestic violence, you know, just all of that. And so for her then to be right back in it and not a year later, it just made me wonder how really honest she was about working on herself." Asked whether she saw any patterns in Mother's behavior, Taber answered:

> Well, there just seems to be a lot of chaos and an inability to have any kind of safety—a safe environment. Like there's just been an upheaval since 2020 anyway since I've known of her. You know, there was probably four or five at least pretty significant upheavals, you know. She was in a relationship . . . and then that—she split up from that. And then she got into trouble after that . . . went to jail in December, it was 2020. And then . . . getting beat up by these two, had another relationship with somebody who was in a—in drug court with her, and then was in this other relationship with this man who had lost his wife and who also had meth issues. . . . [A]nd then, of course, having her son removed and—so there was just a lot going on in a short period of time, I mean, within, probably—we're talking about one year.

Taber noted that Mother "had just come off of a family-based services case, so she had been in the system probably a good nine months to a year" before she started to see Taber in this case.

5

Mother admitted to Taber that she had used methamphetamines, and although "whenever there's methamphetamines involved, there's always neglect," Mother never acknowledged having endangered Charles and instead stated "that she knew that she was a good mother and that nobody could tell her otherwise." Taber testified that Mother had difficulty making good choices about her partners—she had been in relationships with men who had stalked her, beaten her up, and used methamphetamines. Taber said that although Mother acknowledged making poor choices, those acknowledgements "didn't fit up with . . . her decision-making," and she kept choosing partners with similar issues. Taber believed that Mother had some "narcissistic personality disorder traits," which make it difficult for her to identify internal problems and work on them. Such traits can also have a connection to a lack of truthfulness, Taber said, adding that she thought that "somebody who's truly narcissistic may not even realize or may not even be willing to admit that what they're saying is not true," that they might "see it as a truthful statement when it really isn't." She said that "it's their reality" and that "[w]ith narcissistic personality traits, you definitely have to worry about truthfulness."

Probation officer Christina Meza supervised Mother in 2019 for several months while she was on bond after being arrested for possession of methamphetamine. Mother was pregnant with Charles at the time, and Meza said that "there were concerns with her consuming methamphetamine during her pregnancy. So we had to ask the Judge to revoke her bond a couple of times just to keep her from consuming and keeping the baby safe." Meza testified that Mother tested positive for drugs and continued to associate with people who were engaged in criminal conduct and using drugs. Mother was eventually placed on probation for four years, but her probation was revoked in 2021 after she was arrested for burglary of a habitation and was "unsuccessfully discharged from drug court."

6

In April, therapist Dawana Flowers testified that she had met with Mother seven times since starting to work with her in February. Mother was consistently in "crisis mode" and "has been in a state of chaos every time she comes." Flowers had been working with Mother on "deescalating" and putting things in perspective and testified that although Mother has coping skills, she is "just all over the place right now just because of how life is right now for her." Mother had been dealing with issues related to housing—"there was some confusion" with one of Mother's former boyfriends about whether Mother was allowed to be in the residence—and she had "just had an accident with her car." Flowers did not have enough information to opine whether Mother could safely care for Charles; she had not seen anything to give her concerns about Mother maintaining her parental rights to Charles; but she understood the concerns that had been raised about Mother's parenting and did not know what had led to the Department seeking to terminate her rights. Mother had not yet successfully completed individual therapy and had not yet started to work on the Department-required parenting skills. Flowers did not believe that any delay in starting therapy was Mother's fault, and when she was asked if it would be possible to address all of Mother's issues and needs by June, she answered, "If we can minimize the drama, yes. We can do some protective parenting with her if we can get the drama minimized, but I don't know at this point if it's enough time to do that."

In the May hearing, Flowers testified that Mother had reported that she had borderline personality disorder. Flowers testified that the disorder can affect parenting skills, saying, "It depends on the level of the severity of the diagnosis which I don't really know how severe it is for [Mother]." She had concerns about "the compulsive behaviors that [Mother] has already exhibited throughout this case,": "making kind of irrational decisions, impulsive decisions, not thinking things thoroughly out, reacting, passive-aggressive personality types

7

come out at that time. It's kind of sometimes a fight-or-flight kind of mode type of personality, and some quick response without sometimes thinking, and that can put a child at risk." Flowers was asked why her testimony had changed so "drastically" since the last hearing, despite having only one additional counseling session with Mother, and Flowers answered that after Mother disclosed her personality disorder, Flowers "looked back" and did some research on the diagnosis, determining that the diagnosis made sense based on what Mother had told her. On the Department's request, Flowers wrote a letter describing her concerns about Opal remaining in Mother's care. Flowers expressed concerns about Mother's borderline personality disorder because Mother had "exhibited a number of the traits associated with this condition," which "has an effect on how a person thinks and feels about themselves and others, resulting in difficulties with daily functioning." She said that Mother participated in counseling "in a frightened frame of mind as a result of continuing terrible experiences in her life" and was "engaging in impulsive and self-destructive behavior." Flowers was concerned that Mother was not on prescription medication, especially given her "history with Child Protective Services," and was "uncertain if [Mother] will be able to provide long-term protective parenting to the minor child in her care."

Flowers testified that Mother has "unmeasurable" tenacity and shows a willingness to try to improve. Mother had "had a lot of obstacles just since I've met her," and "it's always a heightened emotion state, and so to get through that and to navigate that and do everyday life, I have to give her . . . props for that. It's hard."

Henry testified that he met Mother in October 2021 and went out with her for two weeks in December 2021. At the end of the relationship, Mother alleged that Henry had assaulted her, but Henry testified that the case had been dismissed after he provided text messages showing that Mother "had tried to blackmail" him into recanting reports he had made

to the Department that had "hurt her case." Henry said he had told Ricketson that Mother, who was pregnant with Opal, had gone to a house that "was not an ideal place" for an infant; that she was spending time with "disreputable" people; and that she was driving with a suspended license and no insurance. Henry admitted that he had been arrested "[q]uite a few times" and said he did not keep track of how often—"That's my past, not my future." He had been incarcerated at least three times for tampering with evidence, burglary of a building, and burglary of a habitation.

Henry claimed that Mother had been violent towards him on one occasion and that "[v]ery little" of what she said "was the truth." He testified about the mobile home in which she claimed to live and had set up a nursery, alleging that Mother had planned to live with him instead and that "because she was trying to outsmart CPS, she was telling CPS that she was living there and went to set the room up so that she had a place to show for CPS when they came to do the home visits." He alleged that while he was in jail, Mother had taken money from his bank account and had moved into the house he had arranged to rent, changing papers to put her name on them instead of his and leading the homeowner to believe that she and Henry would live together once he was released from jail. He said she had not been evicted because she had been harassing and intimidating the homeowner. Asked whether he had concerns about her as a mother, Henry answered, "I have not had enough of a personal relationship or been involved with her enough to know how she is as a mother. I just know that she takes unnecessary risks, and she's willing to put herself in that position. She's willing to put her child in that position."

Mary Beth Read, the child's Court Appointed Special Advocates volunteer (CASA), testified that she was initially optimistic about reunification because Mother was working with Taber, who has "always done such a good job with the mothers and given them really nice avenues to get back towards their children." She said that Mother had kept up regular

9

visitations and contact with Charles "except for when she was incarcerated and missed a drug test," but that the last visitation was in March 2021.

Read did not believe Mother had demonstrated an ability to provide Charles with a safe environment and recommended that Mother's rights be terminated. She acknowledged that Mother was "trying" but asserted that Mother continues to engage in dangerous behavior. Read also said that Mother has "had a year and a half, and she's done a lot here recently, but she's had a year and a half." Read noted that Mother has had several residences during the case, had been in jail for "most of the case" due to her own actions that led to her arrest, and has had several jobs, saying, "[S]he's good at getting employed, but it—it changes a lot." Read believed that the instability in Mother's life would negatively affect Charles. Read was asked about the condition of Mother's residence. She said that there were stains on the floor near the water heater, a hole in the kitchen floor, and "dead mice around." Read also believed "you almost need an inspection before you say, okay, this is okay to live in." She knew Mother had "done a lot of work, but who knows if the electricity is good, if . . . it's to code."

Read said she tries "to be cautious" with Mother because of reports alleging that Mother had beaten up someone who tried to report her to CPS and has "brass knuckles" and because of Mother's parents' claim that she brought "a Glock" to their house. Read said that she could not disclose Charles's foster family's "name or location due to safety issues." Read testified that the foster family wanted to have their names and location sealed and "wants protection" because "they don't want to be pursued." When Read was first assigned to the case after Charles's removal, she called the family that had adopted Mother's two older children. However, that family "backed away from placement if [Mother] was going to have any inkling of who they were. They just completely dropped the whole idea."

10

Read testified that a report from the beginning of the case said that Charles was "very delayed," and Mother told Read that Charles, who was slightly older than a year, "didn't even know how to use his teeth." He "wouldn't focus on a ball," he "didn't know where his—his nose and toes were," and he "was just kind of a zombie," although Reed conceded that "maybe it was from the long trip he had had, but it was—it was very concerning for a while." At the time of the final hearing, Charles was doing very well in his foster home, where he had been for almost a year, and was "completely assimilated" and "completely embraced." He recently "started having some regression with his emotional regulation," so he and the family had started "trust-based rehab" therapy to address those issues. The family had educated themselves about the therapy and were committed to it, and the parents reported that Charles is making progress, although he "definitely has some issues with his sensory sensitivity." Read testified that the foster parents are "completely willing" to do whatever Charles needs and that he is nurtured and loved in the foster home and "he's progressing. He's growing up." Read said, "I can't say . . . too much good about them because they are doing so much—anything they can to help." The foster family told Read "that [Charles] is the most sensitive child that they have," and Read agreed: "He's always been so sensitive, and . . . I think he needs extra care right now."

In the May 16 hearing, Raven Torres testified that she had become Mother's Department caseworker in March 2022, when the case was transferred from Ricketson. Torres testified that Mother had completed a protective parenting class; was "scheduled to be discharged from her individual counselor, so therefore that's not completed"; had been "previously discharged from her first assigned counselor"; had completed a drug assessment and a psychological evaluation; and had established psychiatric care "in the last week." Torres also acknowledged that Mother had bought a self-help book to work on and learn about her

11

borderline personality disorder, saying, "I do believe that that is great on her for having done that. However, that does not substitute for the establishment of medication management and regular psychiatric care with a provider." Although Mother was in custody for part of the case's pendency, Torres noted that the case had been open since 2020, that Ricketson had worked with Mother to give her information to start psychiatric care, and that although Mother had a psychiatrist referral "set for her to go to" as early as March 2022, she "just had not reached out to secure those appointments until just about last week." Torres testified about Mother's psychological evaluation and her diagnoses of borderline personality; posttraumatic stress disorder (PTSD); generalized anxiety disorder; major depressive disorder; severe amphetamine-type substance abuse disorder in reported remission; and attention-deficit hyperactivity disorder (ADHD). She also stated that Mother's psychiatric evaluation had diagnosed her with depression and PTSD.

Torres said Mother had completed "a few service requests," but "in terms of our evaluation it's more so of an application of the skills learned from these services, and at this time I don't believe that those have been implemented." She had had problems with Mother being untruthful but claiming miscommunication, and she said Mother's lack of truthfulness "poses a serious safety concern with returning the child to the home." Torres also had concerns about the stability of Mother's housing situation because "[t]here's a lot of chaos going on with that"—Torres had not received a copy of a lease, and Mother's and her landlord's stories "don't ever seem to corroborate." Torres further testified that the Department had concerns about the men Mother dated, several of whom "have extensive criminal histories." Mother claimed that the men are coworkers or friends, but Torres noted that photographs posted online "did not corroborate with her story." Torres did not believe Mother had "exhibited any protective

12

parenting skills at this time" and believed that it was in Charles's best interest to stay in his current placement and for Mother's rights to be terminated.

Mother's father ("Grandfather") testified that the words "chaos, drama, recklessness" describe Mother "completely" and that she is "very impulsive" and irrational. He agreed that "[e]verything just seems to turn to crisis." Grandfather testified that Mother had been difficult since before she was five years old and that she was diagnosed with ADHD and placed on medication when she was in kindergarten. A "complete psychological evaluation" conducted when she was seven determined that she did not have ADHD but instead had "personality disorders. They didn't know exactly what it was going to lead to. They said she was going to be a struggle and that she needed extreme structure." Grandfather said that Mother's "personality is awesome," that she is very likeable, and that everybody wants to help her, but that she continues to get in trouble. He testified that "even in sixth grade, she was stealing, lying, fantasizing. Just—I mean, all the things that I hear now that she's doing." Grandfather testified that the family had moved several times because of work or because of Mother's behavior, not to evade CPS. He also said that CPS only got involved with the family one time due to a lie told by Mother. Mother was placed in one boarding school, where she was only allowed to stay for one school year because she was "a resource drain on the school." The school told Grandfather, "We love her to death, but we cannot accept her next year because she takes so many resources from the school, and it's not fair to the other students." Mother "always had issues with boys and following the rules," and when she moved back in with the family in high school, "all hell broke loose." She kept running away and getting in trouble with the police and was arrested after she hit her stepmother. Mother was diagnosed as bipolar and started on medication, but she again started misbehaving, eventually falsely accusing her stepmother of abusing her, which resulted in

13

her stepmother's arrest. At that point, Grandfather kicked seventeen-year-old Mother out of the house. Grandfather insisted that he and his wife had never abused Mother and that the only person who had been abusive was Mother.

Grandfather did not think Mother was "ever going to change," explaining that she had tried to get help and had tried counseling but "never stays on her medicine. She—she just— she self-medicates. She hangs around with bad people." He noted that the present trial had been extended for months, saying, "[S]he's drug this trial out and it's our fault. . . . It's the same thing I've heard all her life. It's an excuse. Everybody elses' fault, not mine." He said that the trial was "like a big flashback" because the case "keeps being drug out, and the manipulation continues." He testified that it "just breaks my heart that we're having to continue to do this" when "we've got this wonderful family that's taking care of [Charles]," saying that "they're awesome people, and they want to take care of [Charles]. They want to raise [Charles], and yet we're still stuck in this, and look at what she's doing to [Opal]."

Grandfather believed that Mother could "[a]bsolutely not" provide a safe home for a child, saying that she had "proven that time and time again. She's already had two taken. Now [Charles]. That's the third, and . . . I can't even believe that they'd even allow her to continue with [Opal]." He believed it was in Charles's best interest for him to stay in his current placement, saying that they "are a very loving family" and that he and his wife had been meeting with them monthly and "we felt very comfortable right from the start."

Mother testified that the subject case was opened in 2020 when she tested positive for methamphetamine while on bond for a drug possession charge. Mother admitted that she had used methamphetamine but insisted she never used drugs while Charles was with her. She also insisted that she never cared for him while still feeling the effects of any drugs. She agreed that

14

she should never have used methamphetamine, that "meth endangers children," and that she had endangered Charles by using methamphetamine, but she did not believe she was currently endangering her child, saying she had "been off meth" after making a mistake. Mother agreed that she had kept Charles away from the Department, asserting that the Department was not trying "to see if he was okay" and that she "knew they were coming to take him."

Mother testified that she had not used "any substance since 2020" and that "the last time I used was the week that I failed that drug test for the probation department in 2020." She testified that the December 2020 hair-follicle test that was positive for methamphetamine showed use four to six months earlier, "not recent use," and that the March 2021 test that was positive for morphine was taken after she was in the hospital after being assaulted—"I got beat up, and I believe—because they did give me pain meds in the hospital . . . so that would explain that." Mother was asked about "at least five missed drug tests" and said "[t]hat there were two or three of them that [Ricketson] allowed me to test the next day because of a work situation and scheduling"; another was "the referral [that] was never sent in on time"; and two others were while she was incarcerated in 2021. Asked about a March 2022 nailbed test that was positive for methamphetamine,[4] Mother said, "I never received those results directly. So I do not believe that those were the results of my nailbed, no, I do not." She said that she had looked at the levels in her December 2020 hair follicle test, which showed levels "at 4,000" from October 2020, when she "actually using meth." The nailbed test showed "levels of 17,000," and Mother said, "To me that seems very extreme. I know nailbeds are said to have gone back—they can go back years, and what I'm being told is that that level would mean that I used several times a day every single day, and that is ridiculous." She insisted that she had "not used any substances at all" and

_____

[4] The Department did not introduce records of Mother's drug test results into evidence.

had not "even been around somebody who could be using who could be possibly sweating it off," concluding that "it is literally impossible for my nailbed to come back with any of those levels." Mother testified, "I am currently sober, and it's an everyday battle, but I am in support groups. I do have a sponsor, and I am working my [Narcotics Anonymous] program."

Mother was put on probation for a drug charge in December 2020 and acknowledged that one of her probation requirements was to avoid "people of disreputable characters or criminal histories." However, Mother said, "That's—that's literally every single person I know." Mother noted that she had intended to pursue a welding certification program but left it because the Department raised concerns about her "hanging out with more criminals" and the welding company is a "second-chance employer," so everyone who works there, including the owners, are convicted felons.

Mother testified that she had only been involved with two men who had "bad histories"—"Robert" and Henry. She said that Robert was only abusive at the end of their relationship when she confronted him about drug use he had been hiding and that she "left him immediately. Did not go back to that relationship." Henry, she said, lied to her about his criminal background, and when she confronted him about it after they had been dating for two weeks, he made excuses that did not make sense. Mother said that she separated from him and immediately told her lawyer and Ricketson about her concerns. However, Henry "would not leave [her] alone" and "put a pickax through the front of [her] car" when she tried to get her belongings and leave. Mother denied trying to blackmail Henry into retracting his statements to Ricketson and said that Henry told her that Ricketson was lying and that Mother needed to "go talk to the police and have his charges dropped and then he would testify to those facts." Mother acknowledged that she knew that a third man, Opal's father, who was currently in jail, had "an

16

extensive criminal history." However, she said that when she met him, he was sober, on bond, wearing an ankle monitor, and following his bond requirements. It was not until she was incarcerated that he "started using again and messing up his life." Mother was asked if she had a long history of involvement "with people with criminal histories," drug use, and domestic violence, and "continu[ing] to make those decisions even today," and she disagreed, saying she had learned from her mistakes and citing as an example the fact that she left Henry "as soon as [she] started seeing red flags, and [she] stayed gone."

Mother testified that she and Henry discovered the house she was currently living in together. She said the house had been uninhabited for about six years and needed significant work to be livable, so she had arranged for work on the plumbing and flooring, using her tax refund money to pay for it and providing the property owner with receipts. The homeowner initially made a verbal rent-to-own arrangement with Mother but changed his mind after Henry started making "harassing telephone calls" to his agent. In the May hearing, Mother was asked whether she would be surprised to hear that her landlord was about to evict her, and she answered, "I talked to [the landlord] three days ago. That was not the case." Mother insisted that she had a month-to-month lease and that the only reason she might be at risk of losing her housing was that Henry was harassing the landlord.

Mother testified that the weekend before the hearing, someone broke into her house and stole various items. Mother thought Henry had committed the burglary because the items that were taken were the same items Henry alleged belonged to him, while "several thousands of dollars' worth of antiques that were out in the open in the house that belonged to the homeowner" were left behind. Mother denied that she had made a fake nursery to mislead the Department into thinking she had appropriate housing for her and Opal and claimed that she

17

had tried to call back two different Department investigators who left their cards while she was not home but that neither "ever scheduled anything with [her]."

Mother testified that she was physically abused by her stepmother "[e]very single day" growing up—"[s]he would hit me, throw things at me, choke me, sit on top of my ribcage. She would sit on top of me, straddling me, and choke me at the same time and tell me I'm going to hell." Mother also testified that her stepmother burned her with a cigarette and once sat her "on top of the stove." Mother said that her schools kept records of her injuries but that "every time there was ever any incident or any occurrence where . . . my parents thought that they were going to get in trouble, we left." Mother disputed her father's testimony, although she admitted that when he married her stepmother, she was "very hostile" and "very hateful." Mother said:

> I haven't really spoken to my parents or had a relationship with my parents . . . in over ten years, so for—I feel like for them to sit here and say that I can't change and to smirk and to just keep on thinking that I'm the same person I was 15 years ago or even 20 years ago 'cause I'm 31 years old, I just feel like that's ridiculous because I've gone through a lot in the time period, a lot, and that right there can change a person. I mean, I've gone to prison. I've lost two other children. I have gone through a meth addiction. I've—I've gone through, you know, psychological issues. I've gone through the trauma of losing my family. I mean, I don't have siblings to call. I don't have parents to turn to. I don't have anything that I see normal people everyday have. I don't have that.

Mother testified that she had paid for her psychiatric evaluation, provided the summary page to Torres, and gave the Department a release form for the full evaluation. She was diagnosed with severe anxiety, clinical depression, and "bipolar moderate," and she testified that the evaluating doctor believes that she has "characteristics of borderline but . . . wouldn't say that I am borderline at this . . . point in time." Mother had started medication the week before the May 16 hearing for anxiety, depression, and bipolar, and she has an as-needed medication for panic attacks or insomnia. She had been discharged from Flowers's services and had made

18

initial contact with a new therapist, who had given Mother "some assignments based on [her] diagnosis" and wants Mother "to look into receiving cognitive behavior therapy."

Mother testified that when she was released from jail in December 2021, she immediately contacted Ricketson and asked him "to send referrals in for whatever I needed to do and to let me know immediately when and who and where I needed to go so that I could start on my services." She started working on parenting classes, therapy, and a psychological evaluation, and spoke to Ricketson about housing assistance so she could get her own residence. Mother also insisted that she sends her work schedule and paycheck stubs to her caseworker, her attorney, and CASA "as soon as [she] receive[s] them."

Mother agreed that she had not successfully completed her service plan. However, she disputed Taber's testimony that Mother had "an issue with truthfulness," stating that she and Taber "have a long history with each other" and that she had not told Taber that she had been hit by a boyfriend because it was embarrassing. Mother said it was "ridiculous" for Taber to base an assertion of untruthfulness on Mother's refusal to say who had hit her. She insisted that she had not lied to Taber about any boyfriends, denied that her life was chaotic or that she was frequently in crisis, and said, "I tend to get the short end of the stick quite often."

Mother pled "the Fifth" and refused to answer questions about her pending charge for burglary of a habitation. She denied that she had admitted that she used Henry's credit cards without his permission while he was in jail and said she had "never used anyone's cards without permission." She said Flowers "took it—like I said, perception, because of what it looks like. He was in jail. So . . . it looks like one way when it wasn't that at all." Instead, she testified, "I had permission, and I was actually told to purchase those items for my daughter."

Mother talked about her plans if Charles were returned to her care, explaining that she wanted to get him involved in a preschool program with children his age, to help him with his sensory issues, and to engage in bonding therapy with him so that both she and Charles could address "all the trauma that we've both been through." She talked about her current routine with her job and how she uses Opal's grandmother for babysitting and described the room she had set up for Charles and the items she had gotten for him. Mother testified that she had fixed her plumbing, water heater, and flooring and that her residence had been inspected to be sure the plumbing and electrical systems were safe. Mother said she had a support system though Opal's grandmother and aunt, Mother's boss, and some friends she had made at work. She is working with her therapist to address her PTSD, explaining that it was caused by being abused sexually, physically, mentally, and verbally as a child. She had bought a workbook on borderline personality disorder and was working though it in her spare time. Mother testified that there will be "a dramatic difference this time" because she had found a doctor she can meet monthly to be sure she finds the right medications, she can talk to a therapist every week to address interim concerns, and the office will do ongoing assessments instead of "a one-time psych eval."

In the June de novo hearing, Department investigator Janna Miles testified about the case that was opened in mid-January 2022 for Mother and Opal, who was born in late December 2021. Miles was assigned to the case in March 2022 and testified that Mother had "been complying with everything I've asked" and had been cooperative, communicative, and proactive. Mother was engaged in therapy, had "sought her own mental health treatment" and had found a psychiatrist and therapist to work with, was working through a "self-paced book," and was taking medication to treat her mental health. In addition, she had completed a protective

parenting class, was in the process of completing a family-violence program, and would be taking another protective parenting class when she finished the family-violence program.

For the most part, Miles did not request additional drug testing because Mother was already doing "random drug testing for Burnet County." Miles acknowledged that Mother had tested positive for methamphetamine in a March 2022 nailbed test but explained that she did not consider that test overly concerning because "a nail bed test goes back six to nine months," which would be before Opal was born. Miles was questioned about whether she should have been concerned about a test indicating drug use while pregnant, and she answered, "[T]hat's speculation. So I can't—I can't be biased." She also stated that although the drug test indicated that Mother "[p]ossibly" used drugs while pregnant, "I can't answer that with confidence." A hair-follicle test taken in early April, which indicated the preceding three months, was negative, and Miles noted that when Opal was born, Mother's urine test was negative; as a result, Opal's urine and meconium were not tested. Miles acknowledged that Mother might have used methamphetamine while pregnant with Opal but said, "I know that since [Opal] has been born and she has been caring for [Opal], [Mother] has not used any drugs."

Miles knew of Henry and said there had "been speculation" that he had been harassing Mother since she was released from jail. Despite that alleged harassment, Miles agreed, Mother had tried to keep "bad influences out of her life." Miles noted that Mother had stopped her welding classes because there were "some people there that had some past," and Mother "did not want to be around anyone that would cause any issue in her case." She had stayed in her new job since leaving the welding course. Miles had visited Mother's residence several times and described it as a doublewide trailer with three bedrooms that was safe and appropriate for Opal. Mother had all the items necessary to provide for Opal—formula, clothing,

21

and sleeping arrangements. She testified that she had heard concerns that Mother might be getting evicted, so she spoke to the landlord and verified that although Mother was renting month to month without a written lease, there was no eviction process currently underway.

Miles had observed Mother with Opal and said that Mother exhibited an appropriate maternal instinct and had arranged for appropriate childcare while she worked. Miles testified that with regard to Opal's case, the Department was "looking to close the case" if Miles can ensure that Mother has switched to public resources to continue managing her mental health concerns:[5] "Although she's already established mental health and she is taking medication, before I close the case I want to ensure that she's continuing to follow up with her mental health and continue to address it. And—but everything else I have no concerns." The Department questioned Miles about her knowledge of Mother's mental health issues or her efforts to get treatment, raising concerns about whether Mother had seen a psychiatrist at all and whether she had recently been unsuccessfully discharged by her therapist. Miles testified that she had not delved closely into whether Mother had obtained a psychiatric evaluation, as opposed to a psychological evaluation, and thought Mother had been discharged from therapy because the case was coming to an end. Miles did not know what service plan had been put into place for Charles and could not speak to his case or the appropriateness of termination in the subject case.

The Department introduced into evidence documents related to: Mother's charge for possession of methamphetamine in November 2016; her plea of guilty to that charge, resulting in a six-month jail sentence; a 2017 charge for possession of methamphetamine that

---

[5] Mother initially started treatment by finding her own therapist and psychiatrist, but for financial reasons was having to switch to a public mental-health provider.

was dismissed as part of the 2016 guilty plea; her admission that in October 2016 she had possessed marijuana and a prohibited weapon, "KNUCKLES"; her indictment for possession of methamphetamine in July 2019; the revocation of her bond on that charge alleging that she had tested positive for methamphetamine in November 2020; her December 17, 2020 guilty plea to that offense in exchange for a probated two-year sentence; the revocation of her probation alleging that she had committed burglary of a habitation in May 2021, had not successfully completed the drug court program, and had not paid various fees; and her September 24, 2021 plea of true to those revocation allegations in exchange for a seven-month jail sentence. Mother introduced her psychological evaluation from January 2022, which diagnosed her with borderline personality disorder, PTSD, generalized anxiety disorder, major depressive disorder, stimulant use disorder, and ADHD. The report recommended a psychiatric evaluation, a drug abuse assessment, psychotherapy, dialectic behavior therapy, drug testing, a parenting class, NA or AA, and a domestic violence awareness class.

At the conclusion of the de novo hearing, the trial court took the case under advisement, eventually signing an order that found statutory grounds under subsections (D), (E), and (O); found that termination was in Charles's best interest; and terminated Mother's rights. Mother asserts eight issues challenging legal and factual sufficiency of the evidence supporting the trial court's finding of statutory grounds under subsections (D), (E), and (O) and the court's finding of best interest. She also asserts that the trial court did not employ, as required by due process, a review of Charles's best interest under "a two prong test, i.e, 1) proof, by clear and convincing evidence, of at least one statutory ground for termination, AND 2) proof, by clear and convincing evidence, that termination is in the best interest of the child, in accordance with Texas Family Code 161.001."

23

# STANDARD OF REVIEW

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards.[6] The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630–31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and consider whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

---

[6] Mother also includes an issue asserting that this Court must "conduct a de novo review in parental termination cases." However, as noted above, the standard of review employed in parental-termination cases is set out in established case law from the Texas Supreme Court, this Court, and our sister courts. *See, e.g.*, *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

**STATUTORY GROUNDS**

Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being, *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Subsection (D) focuses on the child's physical environment, and the parent's conduct can be a factor in producing an environment that threatens the child's well-being. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). The factfinder may consider the parent's conduct before and after the child was born and may infer that a parent's absence from the child's life endangers the child's emotional well-being." *Id.* (citing *M.D.M.*, 579 S.W.3d at 765). "A single act or omission can support termination under subsection (D), but termination under subsection (E) must be based on "a voluntary, deliberate, and conscious course of conduct." *J.G.*, 592 S.W.3d at 524.

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009);

25

*see In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (evidence of parent's drug use or that parent allowed child to be around drug user may show "voluntary, deliberate, and conscious course of conduct" that endangers child); *A.C.*, 577 S.W.3d at 699 ("A parent's illegal drug use may constitute endangerment under subsection (E)."). Indeed, a factfinder "is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination." *A.C.*, 577 S.W.3d at 705; *see In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Further, although mere imprisonment on its own will not establish a course of endangering conduct, evidence related to a parent's imprisonment can be relevant to establishing such a course of conduct. *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987); *see also In re J.F.-G.*, 627 S.W.3d 304, 316 (Tex. 2021) (parent's lengthy absence from child's life resulting from parent's criminal conduct—as opposed to "single, short-term incarceration"—may be sufficient evidence to establish pattern of conduct "inimical to the very idea of child-rearing" and can support finding of endangerment). In other words, a "long history of drug use and irresponsible choices" has probative value, *J.O.A.*, 283 S.W.3d at 346, as does intentional criminal activity that exposes the parent to the possibility of incarceration and introduces an element of instability into the child's life, *see, e.g., D.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.).

Mother's two older children had been removed from her care and her parental rights to them were terminated. While on bond and pregnant with Charles, Mother tested positive for methamphetamine, resulting in bond revocations to try to keep the unborn baby safe. Mother participated in a family-based safety services cases related to Charles, and the Department opened the subject case after Mother again tested positive for methamphetamine.

Mother evaded the Department's attempts to check on Charles's welfare, and he tested positive for methamphetamine despite Mother's insistence that she never used the drug when she was around him. Mother largely tested negative for drug use throughout the case, but she tested positive for morphine once, her nailbed test conducted while the final hearing was underway was positive for methamphetamine, and she missed a few tests, which are deemed positive. *See In re J.W.*, 645 S.W.3d 726, 734 (Tex. 2022) ("As for the required drug testing, Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive."); *J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at *6 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (parent missed more than twenty drug tests, which trial court could have presumed would have been positive).

In addition to Mother's drug use, which occurred while she was pregnant with Charles and during his infancy, Mother was placed on probation for a drug possession charge but had her probation revoked after she tested positive for methamphetamine and was arrested for burglary, charges which were still pending at the time of trial. Mother was incarcerated for about six months during the pendency of the case, a period during which she did not work any services and could not see Charles. Henry alleged that she had used his money without his consent while he was in jail and that she had falsified documents to move into the house he had intended to rent. Mother has a track record of surrounding herself with people who are drug users, have criminal records, or are violent. Indeed, she testified that "literally every single person" she knows has a criminal record, although she did say that she had quit a welding program to try to avoid contact with such people. Several witnesses expressed concern that Mother has a pattern of choosing unsuitable partners, resulting in instability and domestic violence. There were also questions raised about Mother's living arrangements, with Mother insisting that she had a stable

27

month-to-month situation, placed at risk only by Henry harassing the landlord and his agent, and Torres expressing concern that the landlord did not agree. Grandfather testified that Mother has long had mental health issues and has a pattern of stopping medication and instead self-medicating, resulting in a slide back into instability. Finally, multiple witnesses stated that Mother's general circumstances were chaotic and that she was in a near-constant state of crisis.

Mother disputed much of the Department's testimony, insisting that she had achieved stable housing and employment and denying that she had a track record of making bad choices. She also disputed the nailbed test results and explained that the test that was positive for morphine was related to her having been hospitalized after being assaulted. However, the trial court heard the testimony of the various witnesses and was entrusted with weighing the witnesses' credibility and determining how to resolve disputes in the evidence, and we cannot second-guess those decisions. *See J.F.-G.*, 627 S.W.3d at 312 ("Because the factfinder 'is the sole arbiter of the witnesses' credibility and demeanor,' appellate review must defer to the trial court's factual determinations, even in parental termination cases." (quoting *J.O.A.*, 283 S.W.3d at 346)). Based on this record and the deference we must pay to the factfinder's determinations related to credibility, the trial court could have found by clear and convincing evidence that Mother had endangered Charles—both by her course of conduct and by placing him in an environment that threatened his well-being: using methamphetamine while pregnant and in his presence during his infancy, engaging in criminal activity that resulted in her incarceration, surrounding herself with others who engage in criminal or violent behavior, and delaying seeking appropriate mental health assistance until the final hearing was underway. *See, e.g., E.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *8 (Tex. App.—Austin Dec. 28, 2022, no pet.) ("Evidence of a parent's drug use, or evidence that

28

another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D)." (quoting *In re C.V.-L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied))); *C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00164-CV, 2021 WL 3073263, at *4 (Tex. App.—Austin July 21, 2021, no pet.) (mem. op.) (sufficient evidence to support finding under (E) when mother used marijuana while pregnant, physically assaulted children, left illegal drugs in children's reach and used drugs in their presence, was previously convicted for injury to child, absconded with children without notifying other state's child-welfare agency, exhibited symptoms of mental illness and admitted having mental-health needs but was not taking medications, tested positive for methamphetamine during case, failed to complete most court-ordered services, was only minimally cooperative during the FBSS period, refused to allow children to attend therapy, failed to address children's special needs, and was currently incarcerated); *T.A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *4 (Tex. App.—Austin Jan. 8, 2021, pet. denied) (evidence of parent's mental instability or of domestic violence in home can support finding of endangerment under (D)). Thus, we hold that the evidence is both legally and factually sufficient to support the trial court's findings of statutory grounds under subsections (D) and (E). We overrule Mother's fifth, sixth, seventh, and eighth issues. Because we have upheld the finding of grounds under subsections (D) and (E), we need not consider Mother's issues related to subsection (O). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

**BEST INTEREST**

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the child, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1.

Mother asserts that there was "little to no testimony as to how [Charles] is doing in his current placement" or what services he was receiving that Mother could not offer. However, Ricketson, Torres, Read, and Grandfather all testified that Charles was thriving,

30

happy, loved, and secure in his foster placement. Read testified that Charles had been "very delayed" when he came into the Department's care and that he had made excellent progress in his foster home. They all agreed that it was in Charles's best interest for Mother's rights to be terminated and for Charles to remain with his foster family, which hopes to adopt him. Read testified about the therapy that the foster family had engaged in to try to help Charles work through past trauma, and multiple witnesses testified that the foster family was meeting his every need and committed to doing so in the future. Charles, who was not yet three at the time of trial, was removed from Mother's care when he was just over a year and had lived with his foster family since. He was too young to express his wishes, but the testimony was that he was bonded with and loved by his foster family. *See C.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00250-CV, 2021 WL 5018839, at *8 (Tex. App.—Austin Oct. 29, 2021, pet. denied) (mem. op.); *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.).

Mother was employed and had housing, a residence that Miles testified was safe and appropriate, but there were questions raised about whether her housing situation was as stable as she claimed it to be. Mother seems recently to be engaging in services and attending to her mental health, but evidence indicated that she did not consistently avail herself of services or engage in therapy until late in the case's pendency, nor did she establish psychiatric care until the hearing was underway. Multiple witnesses testified that Mother's life was generally in a state of chaos and crisis. Grandfather expressed concerns that Mother has a pattern of getting help and finding stability before going off her prescribed medications and self-medicating, and Taber expressed similar concerns, noting that Mother had worked on the same issues in an earlier parenting class but did not seem to have internalized any of the information given in that class. Mother used methamphetamine while pregnant with Charles and while he was in her care, and

31

she appears to have done the same with Opal, although Miles said she could not be sure of that fact. *See In re E.W.*, No. 10-16-00132-CV, 2017 WL 4079713, at *6 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) ("evidence of past misconduct or neglect can be used to measure a parent's future conduct"). And although Mother argued at trial and again argues on appeal that the trial court should instead have granted "a less restrictive order, such as a permanent managing conservatorship to the Department," the court could have weighed whether the stability offered by termination and adoption would better serve Charles's best interest than would an impermanent foster-care arrangement. *See C.F.*, 2021 WL 5018839, at *9 (rejecting parent's argument that conservatorship arrangement would serve child's best interest and noting that "courts have long recognized that stability and permanence are of the utmost importance to a child's best interest," that factfinder may consider consequences of refusal to terminate parental rights, and that child's best interest "may be served by termination so that adoption may occur rather than the temporary foster-care or parent-child conservatorship arrangement that would result" otherwise); *L.R.*, 2018 WL 3059959, at *1 ("factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered" (quoting *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.))).

Considering the evidence in light of the *Holley* factors, again giving proper deference to the trial court's determinations of witness credibility and the weight to be given to the evidence, the court could have found that clear and convincing evidence supported a conclusion that termination is in Charles's best interest. *See, e.g., In re V.A.*, No. 13–06–00237–CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg

32

Feb. 1, 2007, no pet.) (mem. op.) (considering parent's history of "unstable housing, unstable employment, unstable relationships, mental health issues, and drug and alcohol usage"). We hold that the evidence is legally and factually sufficient to support the court's best-interest finding and overrule Mother's third and fourth issues.

Mother argues in her second issue that the trial court could not have performed a proper evaluation of Charles's best interest because the "uncontroverted evidence that neither termination, nor removal is in the best interest of [Opal] negates any argument that it is in the best interest of [Charles] that his mother's rights should be terminated." In essence, she insists that because Miles testified that she intended to close Opal's case and leave the baby with Mother, the Department could not have established that termination is in Charles's best interest. However, as our sister court noted when presented with an argument that the Department cannot seek to terminate a parent's rights to one child if it is not also seeking to do the same as to another, "[t]hat is clearly not the case, [and] we must determine best interest as it applies to each child and his particular circumstances." *In re T.R.*, No. 01-18-00834-CV, 2019 WL 610766, at *6 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, pet. dism'd w.o.j.) (mem. op.). As in that case, one child's best interest "is not necessarily the same as" another child's, and "the evidence is not legally and factually insufficient simply because the Department is not presently seeking termination" of the rights to all of a parent's children. *Id*. The facts relevant to this case date back to well before Opal's birth and include Mother's drug use while pregnant with Charles and while he was in her care as an infant, her absconding with him rather than allowing the Department to ensure his safety, her ongoing engagement with men who were violent or drug users, her arrest for burglary that resulted in incarceration for six months, and her apparent reluctance to engage in Department mandated services to improve her parenting skills and

33

mental health. The fact that she seems to be making better progress recently does not negate what came before Opal's birth. And the fact that Opal's caseworker has drawn different conclusions about Mother's stability and appropriateness as a parent does not negate the conclusions drawn by Ricketson, Torres, and Read as related to Charles, nor does it require the trial court to have found that termination is not in Charles's best interest, particularly given the testimony about the child's unique emotional needs. *See id.* We overrule Mother's second issue.

## CONCLUSION

We have overruled Mother's challenges to the evidence supporting the trial court's finding of best interest and of statutory grounds under subsections (D) and (E). We have further overruled her assertion that the trial court's best-interest determination was bound by the Department's decisions in Opal's case. We therefore affirm the trial court's order terminating Mother's parental rights to Charles.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: March 3, 2023