**Affirm and Opinion Filed August 26, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-24-00310-CV
No. 05-24-00332-CV
No. 05-24-00333-CV

## IN THE INTEREST OF C.S., BABY GIRL S., AND E.S., CHILDREN

**On Appeal from the 256th Judicial District Court
Dallas County, Texas
Trial Court Cause Nos. DF-23-02979,
DF-21-06048, DF-21-16023**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Goldstein
Opinion by Justice Molberg

Mother appeals from the trial court's decrees terminating her parental rights to E.S., I.S.,[1] and C.S. In three issues, she contends the evidence was legally and factually insufficient to support the trial court's findings that terminating Mother's parental rights was in the best interest of each of the children. For the reasons explained below, we affirm in this memorandum opinion.

---

[1] We will refer to Baby Girl S. as I.S. throughout this opinion.

## Background

On April 15, 2021, E.S.'s great-uncle (Uncle) petitioned the court alleging E.S.'s present circumstances were significantly impairing the child's physical health or emotional development. He sought to be named conservator of E.S. and requested that Mother have no right to possession or access to the child. Uncle also sought a temporary restraining order restraining Mother from disturbing the peace of the children, hiding or secreting the children from him, and using alcohol or illegal drugs prior to or during her possession of the children. He asked the court to order the children be placed in his possession. In Uncle's attached affidavit, he stated that Mother was exhibiting "mental issues," was living in unsanitary conditions, and was neglecting E.S.'s medical, dental, and feeding needs.

On September 29, 2021, the Department filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent–child relationship. The affidavit attached to the petition alleged the Department received a referral of neglectful supervision of newborn I.S. and four-year-old E.S., that Mother was abusing marijuana, and had "mental health concerns which include hallucinations and violent tendencies" and refused to see a psychiatrist. The affidavit stated Mother told the child's doctor they were "locked in" at their home and she was refusing to take the children for doctor visits. It stated E.S. was non-verbal and Mother had not pursued speech therapy. The

affidavit stated, among other things, Mother had broken windows in the house, the home was unsanitary, with numerous roaches and flies on the walls "all over the home," cracks in some baseboards with exposed insulation, debris on the floors, and food left out for long periods of time.[2] The trial court appointed the Department temporary managing conservator of E.S. and I.S. on September 29, 2021.

On March 6, 2023, the Department filed another petition for protection of a child, for conservatorship, and for termination in suit affecting the parent–child relationship relating to Mother's newborn child, C.S. The attached affidavit stated, among other things, the Department was concerned that Mother had "not properly addressed her mental health and substance use" in her pending cases with E.S. and I.S.; Mother's home was not in a safe condition for a newborn child—it lacked running water, power, and had exposed wring in certain walls and areas of the floor and broken tiles on the floor in other areas; and Grandmother told the Department that Mother was bipolar and was not being treated and that there was "domestic violence between" C.S.'s father, R.C., and Mother.

---

[2] The affidavit also reflected that Mother had a history with the Department, going back to 2017 when E.S. tested positive for marijuana at birth. Later that year, Mother was referred to parenting and drug abuse classes following concerns of neglectful supervision of E.S. and domestic abuse between Mother and E.S.'s father M.T. In 2020, Mother was referred for Family Based Safety services following concerns about neglectful supervision and medical neglect of E.S., serious mental health issues of Mother, and domestic violence between Mother and her partner. In April 2021, the Department was concerned about the same issues, as well as concerns about the home environment, but the Department's "case was closed due to uncle planning to file for custody."

A bench trial on termination was held, beginning in March 2023.[3]  Uncle testified he is Mother's uncle and Grandmother's brother.  He said that, in 2021, he sought guardianship of E.S. because he was concerned for her well-being.  Her medical care and "just her basic care" were not being tended to.  Uncle said E.S. was "born with blood problems" requiring surgeries, which Mother had not pursued.  Further, E.S.'s dental care was being neglected, and she was not being given "her shots and things of that nature."  Because "those things were not proceeding," Uncle felt he needed to intervene on E.S.'s behalf.  Uncle also said E.S. could not speak at all—or she "might be able to say a few things and sort of maybe understood if she was trying to say something"—which was concerning for a four-year-old.  Uncle said the Department became involved and tried to work with Mother to get E.S. the care she needed.

Uncle said Mother had mental health problems she was neglecting.  He wanted the Department to evaluate her so she could possibly be prescribed helpful medication.  He said Mother smoked "a lot of marijuana," and he thought this contributed to her poor mental state.

Uncle testified he was also concerned about Mother's relationship with her boyfriend—and the father of I.S. and C.S.—R.C., who lived with Mother and E.S.  "There was a lot of screaming" and "a lot of fighting," which he said was "very

---

[3] Trial commenced only on the cases regarding E.S. and I.S.  During trial, however, after the case regarding C.S. received a trial date on termination, the trial court ordered that all three cases be tried simultaneously as a matter of judicial economy.

–4–

unhealthy for the child." He said R.C. was hitting or assaulting Mother, and on one occasion "he actually took a drill to her." Uncle said Mother was no longer in a relationship with R.C. but that "he keeps coming around," sometimes to borrow money. He said R.C. "continued to bring over different women to the house."

During the case, E.S. was placed with Uncle, yet Mother forcibly removed E.S. from Uncle's possession on two occasions, and the police had to be called to return E.S. to Uncle both times. Eventually, Mother became pregnant with I.S. and moved in with Uncle, "so then it was a moot point."

After E.S. and I.S. were placed in foster care, Uncle no longer wanted to pursue guardianship because Mother was "starting to get better" and was working with the Department; he wanted to see what happened. He could not "take care of the three girls in any kind of way," given his age, but wanted to help Mother. He planned to move into Mother's house on Polk Street, which was "still being fixed up" at the time of trial. He said the children would not be able to stay where he currently lived with Great-Grandmother on Vernon Avenue because there was no room. Uncle was concerned about R.C., who "continue[]d to bring over different women to the house."

Brianna Soto, a Department caseworker, testified that E.S. was six years old at the time of trial, I.S. was two years old, and C.S. was almost ten months old. E.S. and I.S. were first removed from Mother's care in September 2021 when I.S. tested positive for marijuana at birth and concerns arose about medical neglect and

neglectful supervision of E.S.  The trial court admitted photographs of E.S.'s teeth, which appeared to be severely decayed.  Soto said Mother had been living on Vernon Avenue in Dallas with the children and Uncle and Great-Grandmother at that time.

Soto said C.S. was born in February 2023 and was removed because Mother tested positive for methamphetamine in March 2023 shortly after C.S. was born.  Furthermore, she said Mother was "still involved with [E.S.] and [I.S.'s] case, there was still concerns with her living conditions in her home and she had not made significant progress in her services."  Soto acknowledged, however, that Mother had completed some of her services.  She said the biggest safety concern in the case and biggest barrier to reunification was Mother's "drug use and history."  She said Mother's drug of choice was methamphetamine.  That was why, she said, Mother was recommended to complete an intensive outpatient program, which she said Mother had never started.

Soto testified Mother was ordered to complete individual counseling, parenting classes, a psychological evaluation, a psychiatric evaluation, drug and alcohol assessments, and random drug testing.  Mother completed parenting classes, a psychological evaluation, a psychiatric evaluation, and one drug and alcohol assessment.  She failed to complete the assessment ordered in C.S.'s case.  She was further recommended to complete intensive outpatient treatment, which she did not complete.

Soto said Mother took drug tests at just three times over the course of the case: a urine test in November 2021, urine and hair tests in March 2023, and a toenail test in September 2023. The Department requested the toenail test because it captures a longer period of time, and Mother had not tested for several months. The September 2023 toenail test was positive for methamphetamine. Soto said Mother took just a handful of drug tests despite tests being requested roughly once a month, or about twenty-four requested tests in total over the course of the case. She said Mother failed to take at least half of the requested tests. On cross-examination, Soto acknowledged that toenail tests can capture drug use within the past twelve months and that Mother also took a urine test in September that came back clean.

Mother's drug test results were admitted. They reflected that, in November 2021, mother tested positive for marijuana on a hair test; in October 2022, Mother's urine test was negative; in March 2023, Mother's hair and toenail tests were positive for methamphetamine and her urine test was negative; later in March and in April, Mother tested negative on hair strand tests; and in September 2023, her urine test was negative and her toenail test was positive for methamphetamine.

Soto said Mother moved into a house on Polk Street in March 2023. Soto visited the house in March and May and took pictures, along with an investigator. Soto described the house as cluttered, with things "strewn about the house," including "several tools laying around the home," with uneven flooring. She

observed a broken window in the front of the house and said the house was not safe for young children. When she visited in May, a few items had been moved but "it appeared mostly the same." The trial court admitted photographs taken by Soto depicting the condition of the house. The pictures depict, among other things, cluttered rooms with debris strewn about; doors removed from theirs hinges; and a broken, boarded-up window with broken glass still in part of the frame. Soto also visited two weeks before the final day of trial and observed that, again, while a few items had been moved, it was "mostly the same." The boarded up broken window was still unfixed. Soto said she had scheduled prior visits to the home but Mother was not present when she arrived; she rescheduled two or three times.

On cross-examination, Soto testified that during visits, Mother handed E.S. her cell phone and "[E.S.] is on her cell phone throughout the visit," I.S. often entertained herself, and Mother gave more of her attention to C.S. She agreed, however, that Uncle and Grandmother were also at visits interacting with the children. Soto said Mother was inconsistent with visits, having missed a handful of visits during Soto's time working on the case and was late for a majority of visits.

Soto said a home study for possible placement was not done on Grandmother's home because she was in the household when the children were first removed and she had "several criminal history charges" involving drug use. Soto acknowledged she was unaware of the condition of the Vernon home at the

–8–

time of her testimony. When asked why the Department thought Mother was not capable of caring for her children, Soto responded, "She has not completed her court ordered services. She tested positive on her drug screens. And she continues to just -- throughout the visits she doesn't put [the children's] best interest -- like their well-being at the forefront." Soto explained the latter comment by saying that she repeatedly had to ask Mother to bring healthy meals to visits instead of "giv[ing] sugary drinks to an infant"; Mother refused to listen "regardless of how many times I've asked her." Soto said that, as far as she was aware, Mother had been working at the same employer during the case.

Soto testified that when she met with R.C. in jail, R.C. provided Mother's address as his contact address. Soto was concerned by this, as there were prior allegations of domestic violence between Mother and R.C. The trial court admitted documents showing R.C. in July 2023 was placed on deferred adjudication community supervision for the first-degree felony of manufacture or possession of a controlled substance with intent to deliver. Soto testified E.S.'s father, M.T., tested positive for methamphetamine and cocaine metabolites during the pendency of the case. He told Soto he was homeless, and she said he failed to visit E.S. during the course of the case.

Soto said the children's foster family wanted to adopt the children, and that was the Department's goal, too. Soto said the issues with E.S.'s mouth, including a tongue tie procedure and fixing her teeth, had been addressed, and that E.S., I.S.,

–9–

and C.S. were in good health. Soto testified that the foster mother unilaterally changed E.S.'s counselor without seeking Department approval, but she was unconcerned "as long as she continues therapy and it's in her best interest that she has someone more consistent or able to address her needs then that's fine." On re-direct, Soto said E.S.'s prior therapist "no showed for three sessions" and canceled at the last minute twice more, so she thought it was appropriate and in E.S.'s best interest to find a different therapist who could be more consistent. She said I.S. and C.S. only knew their foster parents as their parents.

Dr. Myrna Dartson, a licensed psychologist, testified she conducted a psychological evaluation of Mother in October 2022. She did not find Mother to have any mental deficiencies, but she recommended a psychiatric evaluation. Dartson said Mother was evasive about when she started and stopped using drugs. She told Dartson she had not used marijuana for two years, yet, Dartson said, her daughter who was younger than one had tested positive for marijuana at birth. Dartson diagnosed Mother with cannabis use disorder (severe), and unspecified depressive disorder. Dartson recommended Mother participate in drug treatment and undergo random drug testing. Dartson said Mother told her she never had issues with domestic violence in her relationships. She also recommended Mother participate in domestic violence and/or anger management counseling, individual counseling, and parenting classes.

Karen Ricks testified she had been E.S.'s therapist for one year. She said E.S. struggled with communicating and had elevated anxiety relating to transitions and disruptions. She said E.S.'s anxiety was highest on days she had visitation with Mother, it seemed, due to the uncertainty of whether Mother would come or whether it would be Grandmother or Uncle. Recently, E.S. had blossomed and was improving in her self-confidence.

Ricks said E.S. told her she feels safe and supported with her foster parents and has a good relationship with them. E.S. had not told her anything negative about them. When she first started working with E.S., E.S. was reserved and guarded around adult men, but she had grown more comfortable with them. She said E.S. was upset when her foster father left town for business. She said E.S. was very talkative and elaborative regarding her foster family and current activities; in contrast, when Ricks asked her about her previous home environment and visits with Mother, E.S. gave her one-word answers.

Over the course of the case, E.S. had communicated to Ricks she wanted to remain with her foster family. A week before her testimony, Ricks raised the subject with E.S. again, and E.S. told her she wanted to stay with her foster family.

Francine Esquilino testified she began as E.S.'s therapist in August 2023. She had about eleven play therapy sessions with her over the course of the year. Esquilino said E.S. seemed comfortable and happy with her foster family. Normally, when they discussed Mother, E.S. would "shut down" or "have a really

sad demeanor," but once, E.S. told her she wanted to be with Mother. At a later session, Esquilino followed up on the same question; E.S. told her she was happy with her foster family and that she did not want to return to Mother. E.S. did not express any particular thoughts or feelings about her other relatives. Esquilino said E.S. requires "a lot of stability" and that "people coming in and out of her life is very difficult for her." She said E.S. still has difficulty communicating and has a speech impediment.

Esquilino said I.S., who was about two years old, was also present during some therapy sessions with E.S. She said E.S. was a good older sister to I.S. and she helped enforce the house rules. She said E.S.'s and I.S.'s physical development had been appropriate over the course of time she spent with them. Esquilino said E.S. and I.S. seemed to be very happy and she observed "a range of positive emotions" during therapy sessions. She said she thought the fact E.S. was placed with her two sisters contributed significantly to her happiness with her foster family. Esquilino said E.S. portrayed her family as C.S., I.S., and her foster parents. Esquilino testified E.S. needed stability given her history of people coming in and out of her life, speech therapy for her difficulties communicating, and people around her who can provide a sense of emotional security and safety. Esquilino believed E.S. was currently getting those things with her foster family.

Esquilino was concerned about Mother being inconsistent with visits because it affected E.S.; she said it dysregulated E.S. emotionally, which in turn

affected her speech. She said I.S. and C.S. were too young to be affected by such absences because they were too young to process them.

Mother testified that, despite the condition of E.S.'s teeth at the time of removal, she brushed E.S.'s teeth at least two to three times a day. She said the dentist told her the dark brown spots and holes were caused by a nutritional shake she had been giving her. Mother said she had a dental appointment scheduled to fix E.S.'s teeth, but then I.S. was born. She also said E.S. had been brought to all of her annual medical exams and had received her vaccinations.

Mother said the condition of the Vernon house at the time she went to the hospital to give birth to I.S. was not fairly depicted in the Department's photographs—she said things had been moved from an attached garage because "they were doing some painting and moving stuff around" when the Department arrived. She also offered and the trial court admitted her own photographs of the house on Polk—where she resided at the time of trial—showing uncluttered rooms and running water.

Mother said when C.S.'s case was opened, she was able to complete most of the services except for the outpatient substance abuse course. She said she called the service provider back "and that's why I thought I had done all the follow through for the requirement." She also said she completed it for E.S.'s and I.S.'s cases. Mother said she had been doing individual counseling, having completed nine sessions in total.

Mother denied having engaged in any domestic violence generally, and specifically with R.C. She denied having used any illegal substances since September 2021 when E.S. and I.S. were removed. She said any positive drug test since then was wrong. She admitted to using marijuana while pregnant with I.S. but said she did not use it while pregnant with C.S. Mother said she had never used methamphetamine in her life.

Counsel for Mother called Grandmother to testify. Grandmother testified she had a drug possession case from 2019 because she had tenants living in her guest house who "had some questionable activities," while she lived in the front house on the same property. She was unaware of the drug-related activities on the property. The police raided the property and found a bag containing residual methamphetamine. Grandmother said, as owner of the property, she was charged with possession, but ultimately, the "case was dismissed" or she "was found not guilty."

Grandmother said she purchased a property on Vatican Lane where the children could come live if they were not returned to Mother. The property was still being remodeled, "but pretty much everything is done." Grandmother said her understanding as to why she was not considered for placement was because she had been living with Uncle and Great-Grandmother in the unsuitable home from which the children had been removed. She said if Mother's rights were not terminated, she would continue to be a support for Mother. As to the Polk home

–14–

Mother was living in, Grandmother testified they "hope to get that place ready"—"it just need a few updates, a few plumbing issues."

Grandmother said she suspected Mother of using meth in the past, "probably back in 2018, 2017 when she had some problems."  She was aware of physical domestic violence between Mother and R.C., which is why, she said, she did not like R.C.  At one point in her testimony, Grandmother said she did not think Mother smoked meth while in possession of E.S., but later, she said she suspected Mother used meth while she had E.S.—she said she talked to Mother, who denied using meth, but they "brought her to the house and that's why [E.S.] was in the house."

Grandmother reiterated what Mother said about the house on Vernon, that it was being painted and "that's why CPS found everything in disarray."  But she also agreed that the condition of the home was not safe, even for Great-Grandmother.

Grandmother said Uncle intervened when they were concerned about Mother's ability to care for E.S. and I.S.  They "were there almost every day to check on [E.S.] and make sure she had food."  Grandmother said she was aware E.S. came into care with an infection in her body from tooth decay.

Uncle was recalled and he testified and asked the court to allow the children to live with Grandmother at her new residence.

The guardian ad litem for the children reported to the court and asked the court to terminate Mother's rights and allow the children to be adopted by the foster family. She said the only parents I.S. and C.S. knew were their foster parents. She had been to the Vernon home and said it was not habitable, and she did not believe Grandmother would be able to keep the children safe. She said the family had opportunities prior to removal to prevent E.S.'s health from worsening in the first place and to prevent the children from being exposed to drug use, and they failed to do anything. The guardian said Mother failed to take responsibility for her drug use. She did not believe Grandmother was unaware of drugs being sold or used on her property, and could not even "be sure that it was not her drugs," saying it appeared to her during a visit that Grandmother was under the influence. She believed it was in the best interest of the children for Mother's parental rights to be terminated.

The trial court found there was clear and convincing evidence that Mother's parental rights to each of the children should be terminated under family code § 161.001(b)(1)(D) (endangering conditions or surroundings), (E) (endangering conduct), (O) (failure to comply with court order), and (P) (endangering use of controlled substance). It further found that terminating Mother's parental rights was in the best interest of the children under § 161.001(b)(2).[4]

_____

[4] The trial court also terminated R.C.'s and M.T.'s parental rights to the children. Neither party has appealed to this Court.

–16–

**Discussion**

Mother raises three issues on appeal, challenging the trial court's findings that termination of her parental rights to the three children is in their best interest.[5] In conducting a legal sufficiency review in a parental termination case, we determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "[L]ooking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

In factual sufficiency review in a parental termination case, we consider the entire record, including evidence both supporting and contradicting the finding, and determine whether a reasonable factfinder could have formed a firm conviction or belief about the truth of the allegation. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed

<hr>

[5] Mother does not here challenge the trial court's findings on the predicate grounds for termination under § 161.001(b)(1); consequently, we do not address them in this appeal. *Cf. In re K.L.M.*, No. 05-16-01098-CV, 2017 WL 836850, at *7 (Tex. App.—Dallas Mar. 3, 2017, no pet.) (mem. op.) (reviewing trial court's best interest finding and declining to review findings on predicate grounds for termination not challenged by party on appeal).

evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

There is a strong, rebuttable presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE § 153.131(b)); *In re R.D.P.*, 526 S.W.2d 135, 137 (Tex. Civ. App.—Dallas 1975, no writ). This presumption is "based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral and emotional development of the child." *Mumma v. Aguirre*, 364 S.W.2d 220, 221 (Tex. 1963). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re J.C.N.*, No. 05-21-01163-CV, 2022 WL 1284169, at *7 (Tex. App.—Dallas Apr. 29, 2022, no pet.) (mem. op.).

We look to certain non-exclusive factors enumerated by the supreme court in *Holley v. Adams* in determining the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976). These include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals

to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372.

Evidence is not required on all of these factors to support a best interest finding, *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); thus, the absence of evidence on some of these factors does not preclude a best interest finding, "particularly if undisputed evidence shows the parental relationship endangered the child's safety," *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). Indeed, evidence relating to one factor may be adequate in a particular case to support a finding that termination is in the best interest of the child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.).

In its best interest determination, a trial court may infer that past endangering conduct may recur if the child is returned to the parent. *See In re L.N.C.*, 573 S.W.3d 309, 318 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Evidence relevant to § 161.001(b)(1) termination grounds may also be relevant to the question of the child's best interest. *In re C.V.L.*, 591 S.W.3d 734, 753 (Tex. App.—Dallas 2019, pet. denied). However, the question of a child's best interest is not equivalent to a finding of endangerment—"'best interest' is a term of art

encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013). Finally, we note that best interest determinations are made individually, on a child-by-child basis. *See In re A.J.D.-J.*, 667 S.W.3d 813, 835 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Mother contends as to each of the children that "there was very little evidence presented regarding" the *Holley* factors and that the Department failed to overcome the presumption that keeping the children with Mother is in the children's best interest. She also points to evidence that Mother completed her services, including the parenting class; had family support to assist with raising the children; and made her home suitable for the children. Mother argues there was no evidence presented showing Mother could not meet the emotional or physical needs of the children or that she would endanger them emotionally or physically. She also points to evidence that E.S., at least once, told her therapist she wished to remain with Mother.

### 1. The desires of the children

We will consider the pertinent *Holley* factors in turn. Although the child's desires are generally considered neutral where the child did not testify, *see In re C.V.L.*, 591 S.W.3d 734, 754 (Tex. App.—Dallas 2019, pet. denied), other evidence presented at trial pertinent to this factor supported the trial court's findings. E.S.'s therapists testified E.S. expressed a desire to remain with her

–20–

foster family. Mother points out that Esquilino testified that E.S. on one occasion told her she wanted to return to Mother. But Esquilino also testified that more recently, E.S. told her she was happy with her foster family and did not want to return to Mother. This was consistent with the testimony of Ricks, who said E.S. on more than one occasion told her she desired to remain with her foster family.

I.S. and C.S. were too young to express their desires. However, we note that, "[w]hen children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.)).

*2. The emotional and physical needs of, and danger to, the children*

Evidence showed E.S. made significant progress physically and emotionally in the care of her foster family and in working with therapists. Soto testified that all three children were in good health at the time of trial, and Esquilino testified that E.S. and I.S. appeared to be happy children.

As to the emotional and physical danger to the children now and in the future, evidence showed that, previously, Mother neglected E.S.'s needs to the point her teeth were decayed and infected, which endangered E.S.'s health; that E.S. could not talk at the time she was removed from Mother's care despite being four years old; that I.S. tested positive for marijuana when she was born; and that

–21–

Mother tested positive for meth shortly after C.S. was born. Mother worked many of her court-ordered services but not all of them. Even after completing many of these services, Mother nevertheless tested positive for meth in March 2023 shortly before trial commenced. Grandmother testified she was concerned about Mother using meth, and Uncle testified he was concerned about Mother's drug use because he believed it contributed to her poor mental state and chaotic home environment. Mother failed to take about half of the required drug tests. Despite this evidence of drug use, Mother denied ever using meth and denied having problems with drugs, and evidence showed she failed to complete the drug and alcohol assessment in C.S.'s case and did not complete the recommended intensive outpatient program.

There was also testimony that Mother neglected her mental health and was not doing anything to help herself get better. Nothing in the record indicates Mother ever acknowledged these issues or did anything to improve, or, as discussed above, acknowledged drug use, which appeared to be a contributing factor to her mental health problems.

Mother also denied experiencing domestic violence issues with R.C. with E.S. in the home, despite evidence from the Department and her family indicating otherwise. Although Mother was no longer in a relationship with R.C., Uncle remained concerned because, he said, R.C. still came by Mother's house.

> 3. *The parental abilities of those seeking custody, their plans for the children, and the stability of the home or proposed placement*

Evidence showed the foster family wanted to adopt the children, who were healthy and happy in their care and having their needs met.

Evidence showed Mother made some progress working services, had a stable job, and made progress preparing a home where the children could live with her. The Department, however, did not agree with Mother that she had a suitable home for the children to live in. Soto testified that shortly before the final trial date, Mother's home was in "mostly the same" condition as it had been previously, which was cluttered, with uneven floors, and a broken front window, which Mother acknowledged had not been repaired by the final trial date. Furthermore, evidence showed that, when E.S. was in her care, her family decided they needed to intervene on behalf of the child because Mother was not properly caring for her. *See In re C.C.*, No. 05-20-01056-CV, 2021 WL 1573062, at *7 (Tex. App.— Dallas Apr. 22, 2021, pet. denied) (mem. op.) (stating that "a parent's past neglect or past inability to meet the physical and emotional needs of the children are also relevant" in determining parental abilities). And other evidence called into question Mother's parenting abilities, such as Mother repeatedly being told not to give C.S. sugary drinks.

   4. *Any acts or omissions of the parent which may indicate the parent-child relationship is improper*

Much of the evidence discussed above also relates to this factor. Mother's failure to get needed medical care to E.S. early in the case, I.S. testing positive for

marijuana at birth, and Mother testing positive for meth shortly after C.S.'s birth all suggest acts or omissions of Mother indicating the parent–child relationship is improper.

Considering the whole record in the light of the *Holley* factors, and in the light most favorable to the best interest finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that terminating Mother's parental rights to E.S., I.S., and C.S. was in each of their best interest. The Department presented evidence that E.S. did not want to return to Mother, and that all three children were bonded with their foster family and were doing well in their care; that I.S. and C.S. had not lived with Mother for any significant period of time, seeing her only during visits; that Mother engaged in endangering conduct towards E.S., which the trial court could have inferred would recur towards all three of the children; that Mother had continued to use drugs during the pendency of the case, even after completing court-ordered services; and that Mother's parental abilities were insufficient. On the other hand, evidence showed the children's foster parents were meeting the children's needs, had not endangered the children physically or emotionally, and provided stability for the children and wanted to adopt them. Given this, we conclude the evidence is legally sufficient to support the trial court's best interest finding as to each of the children.

Moreover, we conclude that, considering the entire record, including evidence both supporting and contradicting the best interest findings, a reasonable

factfinder could have formed a firm conviction or belief that terminating Mother's parental rights was in each of the children's best interest. The evidence contradicting the court's findings includes evidence showing Mother worked most of her court-ordered services, attended most visits with the children, held a steady job, tested negative for drugs on some drug tests, made progress fixing her home and making it habitable, and could count on some help from Uncle and Grandmother in caring for the children in the future. We cannot conclude this evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination was in the best interests of E.S., I.S., and C.S. In particular, the trial court could have relied on evidence showing that Mother never acknowledged her problem with drugs, failed to take numerous required drug tests, and tested positive for meth mere weeks before trial commenced and after she had already worked services in E.S. and I.S.'s cases, calling into question Mother's ability to provide a safe and stable home for the children. *See In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.) ("[R]ecent improvement alone is not sufficient to avoid termination of parental rights."). Moreover, the supports Mother intended to rely on—Grandmother and Uncle—were present in her life previously when they and the Department first had to intervene to protect E.S.; thus, the trial court could have reasonably inferred Mother's endangering conduct would recur despite that support. Accordingly, we conclude the evidence

is factually sufficient to support the trial court's best interest findings.  We overrule Mother's three issues.

## Conclusion

We affirm the trial court's decrees of termination.

/Ken Molberg/
KEN MOLBERG
JUSTICE

240310F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.S., A
CHILD

No. 05-24-00310-CV

On Appeal from the 256th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-23-02979.
Opinion delivered by Justice Molberg.
Justices Pedersen, III and Goldstein
participating.

In accordance with this Court's opinion of this date, the decree of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 26th day of August 2024.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF E.S., A CHILD

No. 05-24-00332-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-21-06048. Opinion delivered by Justice Molberg. Justices Pedersen, III and Goldstein participating.

In accordance with this Court's opinion of this date, the decree of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 26th day of August 2024.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF BABY GIRL
S., A CHILD

No. 05-24-00333-CV

On Appeal from the 330th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-21-16023.
Opinion delivered by Justice Molberg.
Justices Pedersen, III and Goldstein
participating.

In accordance with this Court's opinion of this date, the decree of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 26th day of August 2024.